**UNITED STATES of America, Plaintiff-Appellant,**

v.

**David KIRK, Defendant-Appellee.**

**No. 85–3107.**

United States Court of Appeals, Eleventh Circuit.

Feb. 10, 1986.

Garry Stegeland, Asst. U.S. Atty., Orlando, Fla., Mervyn Hamburg, Washington, D.C., for plaintiff-appellant.

H.S. Henderson, III, Titusville, Fla., Richard Essen, Miami, Fla., Ron Dion, North Miami Beach, Fla., for defendant-appellee.

Before HATCHETT and CLARK, Circuit Judges, and ALLGOOD *, Senior District Judge.

HATCHETT, Circuit Judge:

In this appeal, the government challenges the district court's finding that law enforcement officers prepared an affidavit submitted in support of an application for a warrant to search a residence with reckless disregard for the truth. We reverse.

## FACTS

On October 31, 1984, an unidentified male telephoned the Orlando, Florida, office of the Drug Enforcement Administration (DEA). The caller informed Special DEA Agent Russ Wise that within the next two weeks, Marianne Gray would depart from Orlando on an early morning American Airlines flight for Hawaii, carrying two kilograms of cocaine concealed on her person. The caller added that Gray had made numerous such trips in the recent past and that the source of her cocaine supply was located "in the Melbourne area" of Florida.

Wise relayed this information to DEA Task Force Agent Edward Porro, who is

* Honorable Clarence W. Allgood, Senior U.S. District Judge for the Northern District of Alabama, sitting by designation.

assigned to the DEA office at Orlando International Airport. Porro's investigation revealed that Marianne Gray was scheduled to depart Orlando for Hawaii on an American Airlines flight on November 4, 1984.

Further investigation revealed that Gray was a guest at an Orlando hotel near Disney World. Toll telephone records for the address which Gray listed on her hotel registration indicated that several telephone calls had been placed from that address to a telephone number listed in David Kirk's name at 1413 Atlantic Street, Melbourne Beach, Florida.

On November 3, 1984, Porro and DEA Agent Michael L. Wong followed Gray, in separate automobiles, from Orlando International Airport, where she dropped off a male companion, to Melbourne. After stopping at a shopping center, she then proceeded to 1413 Atlantic Street. Gray entered the residence, stayed for approximately thirty minutes, and then left in the company of two unidentified males. They did not drive Gray's automobile, but left in a dark colored rental car.

Porro and Wong followed Gray and the two males to a nearby hotel, but lost sight of them after they entered the hotel. DEA Agents John Wallace and Alan Lively, also assigned to the DEA office at Orlando International Airport, met Porro and Wong at the hotel. After a short time, Wallace located Gray and the two males in a hotel lounge. Wallace and Lively entered the lounge to resume surveillance; Porro and Wong positioned themselves across the street from the hotel.

Four other individuals joined Gray and the two males. The group then moved to another lounge within the hotel. To avoid compromising the surveillance, Wallace and Lively decided not to follow the group to the second lounge.

When Gray and her companions left the hotel, the agents followed them to a nearby restaurant, but did not enter.

After dinner, Gray and her companions drove to 1413 Atlantic Street. Gray remained inside for approximately thirty minutes before leaving in her automobile.

Agents Porro, Wallace, and Lively followed her back to Orlando.

The license plate on the dark colored automobile in which Gray and the two unidentified males had traveled indicated that the automobile was rented. Consequently, Wong remained in Melbourne to determine the name of the person who had rented the automobile. His investigation revealed that Darwin Schmidt had rented the car and that David Kirk had signed the rental contract as an additional driver.

On November 4, 1984, Wong and Porro approached Gray at Orlando International Airport as she waited for her flight to depart. Gray consented to a search of her person, which revealed she was carrying a pound of cocaine. In the search incident to Gray's arrest, several used airlines tickets were found indicating Gray's recent travel to Hawaii.

In a subsequent interview conducted in the presence of Gray's counsel, Porro sought to have Gray identify driver's license photographs of Schmidt and Gregory Lake. Wallace and Lively saw the photographs of Schmidt and Lake and identified them as the two males who had been with Gray the night before. Gray, however, denied knowing Schmidt and indicated only that Lake might "possibly [be] involved." Also during this latter interview, Gray acknowledged that she was in possession of the cocaine during her drive "back from Brevard County to Orlando."

Based upon this information, Wong prepared an affidavit and submitted it to a state judge in application for a warrant to search the premises at 1413 Atlantic Street. The affidavit is attached as an appendix.

Relying upon the affidavit, the judge issued a search warrant for the 1413 Atlantic Street premises. Law enforcement officers executed the warrant on the evening of November 4, 1984, while the residence was unoccupied, and seized a small quantity of cocaine.

Later that evening, Kirk and Jeff Hembree, who had been under surveillance, were stopped in the rental car which had

been used the previous evening. Kirk consented to a search of the vehicle. The agents found a briefcase in the trunk of the car, but Kirk refused the agents' request to open the briefcase. A police dog trained in ferreting out illegal drugs gave a positive indication that drugs were in the briefcase.

The officer then arrested Kirk and charged him with possession of the .25 grams of cocaine seized from his home. The officer also prepared an affidavit in application for a warrant to search the briefcase. Relying upon this second affidavit, which was essentially an updated version of the premises affidavit, a federal magistrate issued a search warrant for the briefcase. The briefcase contained $29,641 in cash and a trace of cocaine, undetectable to the naked eye.

## PROCEDURAL HISTORY

On November 20, 1984, a grand jury returned a five-count indictment against Kirk charging him with conspiracy to possess cocaine with intent to distribute (Count I), possession of cocaine with intent to distribute (Counts II, III, and IV), and simple possession of cocaine (Count V). After a four-day trial, the jury returned a verdict of not guilty as to Counts II and III; the court declared a mistrial as to Counts I, IV, and V.

Prior to trial, Kirk moved the district court to quash both the premises and briefcase warrants and to suppress the evidence seized as a result of the searches.[1] The district court denied the motion. On the retrial which results in this appeal, before a different judge, Kirk renewed his motion to quash the search warrants and to suppress the evidence.

■ On February 14, 1985, the district court issued a memorandum opinion in which it concluded that the premises affidavit was prepared in reckless disregard for

the truth; consequently, it granted Kirk's motion to suppress the evidence seized from the residence. Kirk had contended that if the search of his residence was invalidated and the evidence seized pursuant to the search suppressed, then no probable cause existed for his arrest and the search and seizure of his briefcase. The district court concluded, however, that the trained police dog's indication of the presence of narcotics in Kirk's briefcase was "sufficiently distinguishable" from the allegedly illegal arrest to justify a finding of probable cause to search the briefcase. Consequently, the district court denied Kirk's motion to suppress the cash seized from his briefcase.[2]

## CONTENTIONS OF THE PARTIES

The government contends that no issue exists as to whether the misstatements included within the affidavit were made deliberately. The government focuses upon the fact that Wallace and Lively misidentified Kirk and Hembree as known drug traffickers Schmidt and Lake, and argues that the issue is whether the misidentification was made in reckless disregard for the truth.[3] It contends that the misidentification was merely negligent rather than reckless and that, even assuming that the misidentification was reckless, the affidavit in redacted form contains sufficient evidence of probable cause.

In urging us to affirm the district court's suppression of the evidence, Kirk contends that we need not reach the issue of whether Wallace and Lively's misidentification of the two male suspects was made in reckless disregard for the truth. Rather, Kirk points to the numerous statements throughout the affidavit which Wong either expressly or impliedly misrepresented to be based upon his personal knowledge. Once the allegedly deliberate misstate-

---

1. Kirk and his father are co-owners of the premises at 1413 Atlantic Street.

2. Kirk has not cross-appealed the denial of his motion to suppress the cash seized from his briefcase. The denial of a motion to suppress is a non-final order from which a defendant may

not appeal. *United States v. Acosta*, 669 F.2d 292, 293 (5th Cir. Unit B 1982).

3. The agents allegedly did not realize until after Kirk's arrest that Kirk and Hembree, not Schmidt and Lake, were the two men who accompanied Gray on November 3, 1984.

ments are eliminated, Kirk maintains that the nexus as to time and place is so lacking as to be insufficient to justify a finding of probable cause.

## ISSUE

The sole issue on appeal is the validity of the affidavit submitted in support of the warrant for the search of the Kirk residence. We must determine: (1) whether the misstatements included in the affidavit were made deliberately or in reckless disregard for the truth; and if they were, (2) whether in the absence of the misstatements, the affidavit is sufficient to show probable cause to search the Kirk residene.

## DISCUSSION

The analytic framework within which we must address the propriety of a motion to suppress consists of two distinct inquiries. Initially, we must determine whether the movant's fourth amendment rights were violated. Only if we conclude that the movant's rights were violated do we reach the second issue: whether exclusion of the evidence seized is an appropriate sanction. *United States v. Leon,* —— U.S. ——, 104 S.Ct. 3405, 3413, 82 L.Ed.2d 677, 688 (1984); *Illinois v. Gates,* 462 U.S. 213, 223, 103 S.Ct. 2317, 2324, 76 L.Ed.2d 527, *reh'g denied,* 463 U.S. 1237, 104 S.Ct. 33, 77 L.Ed.2d 1453 (1983).

■ Where a challenge is made to the validity of a warrant affidavit, to determine whether the movant's fourth amendment rights were violated, we must consider: (1) whether the alleged misstatements in the affidavit were made either intentionally or in reckless disregard for the truth and, if so, (2) whether, after deleting the misstatements, the affidavit is insufficient to establish probable cause. *Franks v. Delaware,* 438 U.S. 154, 98 S.Ct. 2674, 57 L.Ed.2d 667 (1978).

### I.

After conducting oral argument and an evidentiary hearing, the district court concluded that Kirk had met his burden of proving by a preponderance of the evidence that the misstatements contained in the affidavit were made in reckless disregard

for the truth. This is a finding of fact by which we are bound unless we find it to be clearly erroneous. *United States v. Strauss,* 678 F.2d 886, 893 (11th Cir.), *cert. denied,* 459 U.S. 911, 103 S.Ct. 218, 74 L.Ed.2d 173 (1982); *United States v. Mastroianni,* 749 F.2d 900, 909 (1st Cir.1984); *United States v. Davis,* 714 F.2d 896, 898 (9th Cir.1983).

### A. Misidentification of Kirk and Hembree

■ Viewing the evidence in the light most favorable to Kirk, *United States v. Baron-Mantilla,* 743 F.2d 868, 870 (11th Cir.1984), we hold that the finding of reckless disregard in the misidentification of Kirk and Hembree is amply supported by the record.

The government contends that while Wallace and Lively may have been negligent in their misidentification of Kirk and Hembree, the agents did not act in reckless disregard for the truth. It argues that Wallace and Lively's error should be excused because the agents had never personally seen Schmidt or Lake, and that the presence of the others who joined Gray and the suspects at the hotel made it difficult for the agents to focus upon the two suspects. Although the government acknowledges that Wallace and Lively were able to maintain closer surveillance of the suspects than the other agents, it also argues that the surveillance was not conducted under optimum conditions. We find these arguments to be frivolous.

It is difficult to believe that the surveillance conditions could have been much better in this case. It was mid-afternoon on a clear, sunny day when the agents followed Gray and the two suspects to the hotel. Wallace and Lively observed the suspects for forty minutes from a distance of only fifteen feet. The lounge was admittedly well lit. While the suspects were seated for most of the time, Wallace and Lively observed them walk to and from the second lounge and should have been able to gauge the men's heights. Hembree had bright red hair. The drivers' license photographs from which Wallace and Lively made the

identification do not indicate that either Schmidt or Lake had red hair. The agents' recklessness lies in the fact that they paid no attention to the physical descriptions of the individuals' height, weight, hair color, and age which were listed on the photographs.

The fact that Wallace and Lively were not the primary case agents and were not aware that a search warrant was being contemplated is also of no consequence. Porro was the lead case agent. He not only directed Wong to prepare the warrant affidavit, but also provided much of the information which Wong included in the affidavit.

Porro admitted knowing Schmidt through other unrelated narcotic investigations. Yet, it was Schmidt who was misidentified as the red-haired Hembree. Wong was familiar with Lake's physical appearance. At trial, he admitted to having engaged Lake in surveillance on an unrelated occasion at Orlando International Airport.[4] Even assuming that Lively and Wallace had been only negligent in identifying the suspects, both Porro and Wong, who were also a part of the surveillance team, should have recognized the error, or at least harbored serious doubts as to whether Schmidt and Lake were in fact the two men whom they had observed with Gray.

We note that the photographs of the suspects which were used in the identification had been posted on the bulletin board in the DEA office for "about a year-and-a-half." Furthermore, much of the seven and one-half hour surveillance was conducted during the day. Both Porro and Wong admitted to having used binoculars at various points during the surveillance. Under these circumstances, the agents should have harbored serious doubts as to whether Schmidt and Lake were the two men who had accompanied Gray.

Other evidence in the record also indicates that the agents' misidentification of Kirk and Hembree was reckless. In the interview following her arrest, Gray indicated that she knew Lake and that he might be peripherally involved in the drug scheme, but she denied knowing Schmidt. The government argues that the agents were not bound to credit Gray's disclaimer. True, but the inconsistency gave the agents cause to investigate further.

Porro testified at trial that after interrogating Gray, he asked Wallace and Lively if they were sure of their identification: "After debriefing Marianne Gray, I went back to those agents and said, 'How sure are you about your initial identification of those two subjects? We have a difference.'" Wallace and Lively acknowledged that they could have been wrong in their identification. Thus, this case is distinguishable from *United States v. Edwards*, 602 F.2d 458 (1st Cir.1979), where the agents had no reason to suspect that the information upon which they were relying was incorrect.[5]

### B. Other Misstatements

The affidavit contains several statements which purport to be based upon Wong's personal knowledge, but as to which Wong now admits he had no personal knowledge. Wong received much of the information in

---

4. With the agreement of the parties, the district court considered the record of Kirk's previous trial in reaching its decision. We likewise considered the record of the previous trial.

5. The record does not reflect whether Porro communicated Wallace and Lively's doubts as to their identification to Wong. Wong testified, however, that Porro was the source of much of the information in the affidavit, including the representation that Wallace and Lively had identified Gray's male companions as Schmidt and Lake.

While the district court recognized that the affidavit was misleading in that it implied that

Wong had personal knowledge of the facts stated therein, it was concerned primarily with Wallace and Lively's alleged recklessness in identifying Schmidt and Lake as the two men who had accompanied Gray on November 3, 1984. We focus upon the conduct of all four agents involved. As the Supreme Court stated in *United States v. Leon*, —— U.S. ——, —— n. 24, 104 S.Ct. 3405, 3421 n. 24, 82 L.Ed.2d 677, 698 n. 24, it is necessary to consider the objective reasonableness of both the officers who obtained the search warrant and "of the officers ... who provided information material to the probable cause determination."

the following critical paragraphs from Porro:

> MARIANNE GRAY entered the residence at 1413 Atlantic Street, Melbourne Beach, Florida. Approximately one-half (½) hour passed and MARIANNE GRAY left this residence in a dark blue/black Oldsmobile Cutlass, bearing Florida current tab [sic] ZTA–857. In this vehicle was [sic] MARIANNE GRAY and two white males who were later identified as GREGORY PAUL LAKE and DARWIN LYNN SCHMIDT. This vehicle was surveilled to a local hotel bar and later a restaurant. GREGORY LAKE and DARWIN SCHMIDT are known to the Drug Enforcement Administration. They have been suspects in federal narcotic investigations and have also been investigated by state narcotic agencies in and out of Florida. On November 4, 1984, Agents LIVELY and WALLACE viewed known photographs of DARWIN SCHMIDT and GREGORY LAKE and confirmed these were the individuals who traveled with MARIANNE GRAY on November 3, 1984, in Brevard County.

> MARIANNE GRAY, GREGORY LAKE, and DARWIN SCHMIDT then returned in the same vehicle to the residence at 1413 Atlantic Street, Melbourne Beach, Florida. All the subjects again entered the residence in question. Approximately one-half (½) hour later, MARIANNE GRAY exited the residence and went to her vehicle, a white Chevrolet Camaro. MARIANNE GRAY sat in the vehicle and a white male brought a number of suitcases to her and placed them in the white Camaro. MARIANNE GRAY then drove back to the Orlando area.

Wong acknowledges that he did not see Gray enter the Kirk residence and did not see Gray and the two men leave the residence. When Gray left Orlando, the agents assumed that she would go to the Kirk residence. They determined that Porro would follow Gray directly, but that Wong should proceed to the residence by a different route. Wong testified that when he arrived in Melbourne, he did not position himself so as to maintain visual surveillance of the Kirk residence. Rather, he simply drove around the neighborhood.

While the affidavit states that after returning to the Kirk residence for half an hour, Gray went to her vehicle and a man brought a number of suitcases to her, Wong admitted that he did not observe any such occurrence. In fact, he was not near the Kirk residence at the time. Wong testified that Porro relayed that information to him.[6]

Wong also had no personal knowledge of where Gray went after she left the Kirk residence the second time. At that time, he had broken off surveillance and gone to automobile rental agencies at the Melbourne airport to determine who had rented the Oldsmobile Cutlass.

Wong stated in the affidavit that "[d]uring the surveillance on November 3, 1984, this vehicle was kept in the enclosed garage at 1413 Atlantic Street, Melbourne Beach, Florida." Wong never saw the rental vehicle either exit or enter the garage. Wong also got this information from Porro.[7]

■ Relying upon *United States v. Ventresca*, 380 U.S. 102, 111, 85 S.Ct. 741, 747, 13 L.Ed.2d 684 (1965), the government contends that Wong was justified in relying upon the information which he received from Porro. Kirk concedes that law enforcement officers are entitled to rely upon the information and judgment of other officers. He argues that "[t]he situation is very different [,however,] when application is made for a warrant." *United States v. Davis*, 714 F.2d 896, 900 (9th Cir.1983). Unlike an officer in the field, a magistrate

---

**6.** We note that Porro stated in his investigation report that a male brought *one purse* or a large handbag to Gray, and not "a number of suitcases."

**7.** Porro could not conclusively state that the car was kept in the garage. When questioned about the matter at trial, Porro testified: "I *believe* it was in the garage at that time. I *think* they took it out of the garage of the condo." (Emphasis added.)

must be presented with facts as to the source of the information in the affidavit and the underlying circumstances from which it could be concluded that the source was reliable. *Franks v. Delaware*, 438 U.S. 154, 165, 98 S.Ct. 2674, 2681, 57 L.Ed.2d 667 (1978); *David*, 714 F.2d at 900. We agree with both points.

■ "Observations of fellow officers of the Government engaged in a common investigation are plainly a reliable basis for a warrant applied for by one of their number." *United States v. Ventresca*, 380 U.S. 102, 111, 85 S.Ct. 741, 747, 13 L.Ed.2d 684 (1965); *United States v. Davis*, 714 F.2d 896, 899 (9th Cir.1983). To comply with the requirement of particularity and to enable the magistrate to make an independent probable cause evaluation, however, the agent must state in the affidavit that he is relying upon other officers. *Franks v. Delaware*, 438 U.S. 154, 98 S.Ct. 2674, 57 L.Ed.2d 667 (1978); *United States v. Ventresca*, 380 U.S. 102, 85 S.Ct. 741, 13 L.Ed.2d 684 (1965) and cases cited therein at 111 n. 4; *United States v. Davis*, 714 F.2d 896, 899 (9th Cir.1983). We caution that this requirement should not be viewed "in a hypertechnical, rather than a common-sense, manner." *Ventresca*, 380 U.S. at 108–09, 85 S.Ct. at 745–46. It is sufficient if the affidavit recites at the outset, or if it is clear from reading the affidavit as a whole, that it is based in part upon information obtained from other law enforcement officers. *Ventresca*, 380 U.S. at 111, 85 S.Ct. at 747; *Davis*, 714 F.2d at 899.

■ Wong properly identified the source of the information in the affidavit and outlined the circumstances which indicated the reliability of the information. He stated

that he, Porro, Wallace, and Lively were DEA agents assigned to Orlando International Airport; that, acting upon the anonymous telephone call, they initiated an investigation of Gray; and that the investigation included maintaining surveillance of Gray. Reading the affidavit as a whole, it is clear that the information detailed in the affidavit was derived from all the agents' investigation and surveillance. *Ventresca*, 380 U.S. at 111, 85 S.Ct. at 747. Thus, the statements about which Kirk complains were "truthful" in the sense that Wong believed or appropriately accepted them as true. *Franks*, 438 U.S. at 164–65, 98 S.Ct. at 2680–81.[8]

## II.

■ The misidentification is the only misstatement which was made, if not intentionally, at least with reckless disregard for the truth. Our inquiry now focuses upon whether the affidavit is sufficient to establish probable cause, notwithstanding the misidentification.[9] *Franks v. Delaware*, 438 U.S. 154, 98 S.Ct. 2674, 57 L.Ed.2d 667 (1978).

The traditional standard for review of a magistrate's probable-cause determination is whether a substantial basis exists for the conclusion that a probability existed that evidence of a crime would be found in the particular place sought to be searched. *Illinois v. Gates*, 462 U.S. 213, 236, 103 S.Ct. 2317, 2330, 76 L.Ed.2d 527, *reh'g denied*, 463 U.S. 1237, 104 S.Ct. 33, 77 L.Ed.2d 1453 (1983); *United States v. Betancourt*, 734 F.2d 750, 754 (11th Cir.), *cert. denied*, —— U.S. ——, 105 S.Ct. 440, 574, 83 L.Ed.2d 514 (1984).[10] We hold that the affidavit in redacted form is sufficient to provide a

---

**8.** The affiant in both *Franks* and *Davis* stated that he had personally interviewed the witnesses and informants which he relied upon, when it was another agent who had conducted the interviews. This case is distinguishable from *Franks* and *Davis* in that the challenged statements were not *expressly* represented to be based upon Wong's personal knowledge.

**9.** Even assuming that the misstatements concern the item(s) which were placed in Gray's car and the storage of the rental car were made

either intentionally or with reckless disregard for the truth, it is clear that those statements were not material to the probable cause determination.

**10.** The Supreme Court explained in *United States v. Leon*, —— U.S. ——, ——, 104 S.Ct. 3405, 3422, 82 L.Ed.2d 677, 699 (1984), that "[i]n ... limiting the suppression remedy, [it left] untouched the probable-cause standard and the various requirements for a valid warrant."

"substantial basis" from which to conclude that the agents had probable cause to believe that cocaine might be found in the Kirk residence.

Gray admitted that she was in possession of the cocaine on her return from Brevard County. At the time of her arrest, Gray was in possession not only of cocaine, but also of several used airline tickets indicating her recent travel between Orlando and Hawaii. This information corroborated the anonymous telephone caller's claim that Gray had been acting as a drug courier for some time and that her cocaine supplier was located in the Melbourne area.

This information, coupled with the following factors of which Wong had personal knowledge, was sufficient to provide a substantial basis for the magistrate to conclude that a probability existed that drugs might be found at the Kirk residence: (1) Gray visited the Kirk residence the night before her arrest, (2) prior to her visit, Gray placed several long distance telephone calls to the residence, and (3) Schmidt, an individual notorious for his suspected drug involvement, rented the car which was parked at the residence and in which Gray traveled the night before her arrest.[11]

The suppression remedy was not appropriate in this case. The affidavit in redacted form is sufficient to support a finding of probable cause. Therefore, Kirk's fourth amendment rights were not violated. Accordingly, we reverse the judgment of the district court and remand the action for further proceedings.

REVERSED and REMANDED.

APPENDIX

COUNTY COURT IN AND FOR

BREVARD COUNTY, FLORIDA

AFFIDAVIT

FOR SEARCH WARRANT

STATE OF FLORIDA
COUNTY OF BREVARD

BEFORE ME, Judge of the County Court, in and for Brevard County, Florida, personally came AGENT MICHAEL L. WONG, of the Brevard County Sheriff's Department, Brevard County, Florida, who being first duly sworn, deposes and says: That Affiant is a citizen and resident of said Brevard County, State of Florida, and that he has reason to believe and does believe that those certain premises or curtilage thereof, located in Brevard County, Florida, described as follows, to-wit:

The residence is located at 1413 Atlantic Street, Melbourne Beach, Brevard County, Florida, and is described as a two story townhome facing in a westerly direction. The front exterior is concrete stucco with a dark brown wood facing. There are two windows facing westerly on the second floor, the first floor level has a single car garage door with the numerals 1413 over it. The entry way is located to the left side of the garage door and is set back approximately ten (10) feet. There are three sets of buildings, with 1413 located in the middle set and it is second from the north, bounded by 1411 and is third from the south, bounded by 1415. A screen door is also attached to the front door.

AFFIANT further states that the premises are now being occupied by or under the control of DAVID KIRK, DARWIN L. SCHMIDT, and/or GREGORY P. LAKE, and there is now being kept on or in said premises or curtilage thereof, certain controlled substances, to-wit: Cocaine, which is being kept or used in violation of the laws of the State of Florida, to-wit: Possession and Distribution of a Controlled Substance, Chapter 893, Florida Statutes. That the facts tending to establish the grounds for this application and the probable cause of Affiant's believing that such facts exist are as follows:

On October 31, 1984, an anonymous call was received at the Orlando Drug Enforcement Resident Office. Special Agent RUSS WISE spoke to this unidentified white male caller. The anonymous caller

---

11. Wong was the agent who reviewed Gray's telephone records, and checked with automobile rental agencies and established that Schmidt had rented the rental automobile.

told Agent WISE the following. Sometime in the next two (2) weeks, a female named MARIANNE GRAY would fly out of Orlando to Hawaii, carrying two (2) kilograms of Cocaine. The caller further stated that MARIANNE GRAY would depart on an early morning American Airlines flight and would have the Cocaine hidden on her legs. The caller advised MARIANNE GRAY had done this same thing numerous times in the recent past and that the source of supply for the Cocaine was located in the Melbourne area of Florida. The caller refused further information and the conversation ended.

On October 31, 1984, Special Agent WISE called Task Force Agent PORRO and advised Agent PORRO of the previous mentioned phone call. Agents PORRO, WONG, LIVELY, and WALLACE are all Drug Enforcement Agents assigned to work narcotic smuggling at Orlando International Airport.

On October 31, 1984, Agent PORRO checked reservation history with American Airlines and found a reservation for MARIANNE GRAY to fly to Hawaii on November 4, 1984, departing Orlando at 8:34 A.M.

Investigation and surveillance was initiated concerning MARIANNE GRAY. It was established that MARIANNE GRAY was in company of male friend staying at a hotel near Disney World.

On November 3, 1984, your Affiant observed MARIANNE GRAY drop off this aforementioned male friend at Orlando International Airport. This male friend departed on a commercial flight and does not appear to be involved at this time. At this time, your Affiant and other police agents continued to follow MARIANNE GRAY when she left the airport.

MARIANNE GRAY drove to Brevard County. MARIANNE GRAY proceeded to a residence at 1413 Atlantic Street, Melbourne Beach, Florida. Your Affiant had earlier obtained telephone toll records concerning a listed home address for MARIANNE GRAY in Orlando, via authority of subpoena. These phone toll records show phone calls to a phone number of (305) 727-3718. Phone company records show (305) 727-3718 subscribed to a DAVID KIRK at 1413 Atlantic Street, Melbourne Beach, Florida.

MARIANNE GRAY entered the residence at 1413 Atlantic Street, Melbourne Beach, Florida. Approximately one half (½) hour passed and MARIANNE GRAY left this residence in a dark blue/black Oldsmobile Cutlass, bearing Florida current tab ZTA–857. In this vehicle was MARIANNE GRAY and two white males who were later identified as GREGORY PAUL LAKE and DARWIN LYNN SCHMIDT. This vehicle was surveilled to a local hotel bar and later a restaurant. GREGORY LAKE and DARWIN SCHMIDT are known to the Drug Enforcement Administration. They have been suspects in federal narcotic investigations and have also been investigated by state narcotic agencies in and out of Florida. On November 4, 1984, Agents LIVELY and WALLACE viewed known photographs of DARWIN SCHMIDT and GREGORY LAKE and confirmed these were the individuals who traveled with MARIANNE GRAY on November 3, 1984, in Brevard County.

MARIANNE GRAY, GREGORY LAKE and DARWIN SCHMIDT then returned in the same vehicle to the residence at 1413 Atlantic Street, Melbourne Beach, Florida. All the subjects again entered the residence in question. Approximately one half (½) hour later, MARIANNE GRAY exited the residence and went to her vehicle, a white Chevrolet Camaro. MARIANNE GRAY sat in the vehicle and a white male brought a number of suitcases to her and placed them in the white Camaro. MARIANNE GRAY then drove back to the Orlando area.

On November 3, 1984, Agent WONG found that the dark blue/black Oldsmobile Cutlass, bearing Florida tag ZTA–857, is a National Rental car, currently rented by DARWIN SCHMIDT. During the surveillance on November 3, 1984, this vehicle was kept in the enclosed garage at 1413 Atlantic Street, Melbourne Beach, Florida.

On November 4, 1984, MARIANNE GRAY was interviewed by Agents WONG

and PORRO at the Orlando International Airport, approximately one half (½) hour before her scheduled departure time for Hawaii. A consent search yielded approximately one (1) pound of Cocaine hidden in a girdle worn by MARIANNE GRAY. MARIANNE GRAY was arrested for violation of federal narcotic law and advised of her rights. During search incident to her arrest, numerous used airline tickets were found in the name of MARIANNE GRAY, showing recent prior travel to Hawaii.

In a later interview, MARIANNE GRAY advised she possessed the Cocaine while she was driving back from Brevard County to Orlando on November 3, 1984.

Your Affiant, AGENT MICHAEL L. WONG, has been in continuous law enforcement service for a period of six (6) years. Affiant is currently a certified law enforcement officer by the Florida Police Standards Board. Affiant has attended numerous training schools and seminars coordinated by the U.S. Department of Justice, Drug Enforcement Administration, and is currently assigned as a Task Force Agent with the Drug Enforcement Administration, Orlando Resident Office, Orlando, Florida.

AFFIANT believes that the premises described above is being used in violation of Chapter 893, Florida State Statutes, on a regular bases for Possession and Distribution of a Controlled Substance, to-wit: Cocaine.

Your Affiant would like to request nighttime service concerning execution of this warrant. MARIANNE GRAY would have been due to arrive in Hawaii on November 4, 1984, at approximately 8:30 P.M., Eastern Standard Time. There is reason to believe that other subjects involved in this investigation will realize something has gone wrong when MARIANNE GRAY does not deplane in Hawaii. For that reason, your Affiant believes it is imperative this warrant should be executed as soon as practical, including late evening or early morning hours.

WHEREAS, AFFIANT makes this Affidavit and prays for the issuance of a SEARCH WARRANT in due form of law for the search of the above described premises for the said property, heretofore described and for the seizure and safekeeping thereof, and to search for and seize any and all items/documents from the above described premises that would be evidence in reference to the Cocaine seized from MARIANNE GRAY on November 4, 1984, at Orlando International Airport.

/s/ Michael L. Wong
AFFIANT