[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
APRIL 5, 2010
JOHN LEY
CLERK

No. 09-12760
Non-Argument Calendar

_____

D. C. Docket No. 08-14031-CR-JEM

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

JOSEPH PIQUET,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Southern District of Florida

_____

(April 5, 2010)

Before BIRCH, CARNES and MARCUS, Circuit Judges.

PER CURIAM:

Joseph Piquet appeals his convictions for:  (1) conspiracy to export defense

articles to China, in violation of 22 U.S.C. § 2778 (Count 1); (2) attempting to export and exporting defense articles to China, in violation of 22 U.S.C. § 2778 (Counts 2-4); (3) conspiracy to export restricted technology goods and commodities to China, in violation of 50 U.S.C. § 1705 (Count 5); and (4) attempting to export and exporting electronic components, in violation of 50 U.S.C. § 1705(a) (Counts 6-7). *See* R1-14. After review of the record and the parties' briefs on appeal, we AFFIRM.

## I. BACKGROUND

Piquet was the owner and President of AlphaTronX, Inc. ("Alphatronx"), a registered supplier and distributor of military and non-military electronic components. *Id.* at 4. Through Alphatronx, Piquet ordered and received ALH-376 35-40 and ALH-102C 2-20 GHz Low Noise Amplifiers (ALH-376 and ALH-102C, respectively), and APH-502 Ghz High Power Amplifiers (APH-502)[1] from Northrop Grumman Space Technology ("NG") and then shipped them to Joel Ames, Inc. ("Ames"), a Dallas, Texas-based distributor of electronic components. *Id.* at 7-13. Ames shortly thereafter shipped the components to OnTime Electronics Technology Limited ("Ontime"), a distributor of electronic

---

[1] The APH-502 is an electronic component part used by the U.S. military in early warning radar and/or missile target acquisition systems. *Id.* at 3. The ALH-376 and ALH-102C are electronic component parts used for both commercial and military purposes. *Id.* at 3.

components operating out of Hong Kong. *Id.* at 4, 7-13. The indictment charged specifically that on 12 August 2004, 30 October 2004, and 24 February 2005, Piquet knowingly and willfully exported defense articles, that is, APH-502 components, to China without first obtaining the required licenses from the U.S. Department of State ("DOS"), and that he knowingly and willfully exported ALH-102C and ALH-376 electronic components to China on 26 March 2004 and 11 August 2004, respectively, without first obtaining the required licenses from the U.S. Department of Commerce ("DOC"). *Id.* at 9-10; 13-14.

Before trial, Piquet filed a motion to quash the search warrant issued for Alphatronx's offices and to suppress all evidence obtained as a result of that search. He argued that the application and affidavit in support of the search warrant submitted by Department of Homeland Security, Immigration and Customs Enforcement Special Agent Todd Blekicki failed to show probable cause to believe that evidence of criminal activity relating to the export of defense articles and other restricted goods to China would be found in Alphatronx's offices. R1-50.

In his affidavit,[2] Agent Blekicki stated that, "based upon [his] (a) personal observations and knowledge; (b) conversations with other law enforcement officers

---

[2]Although Agent Blekicki's search warrant affidavit was not made part of the record on appeal, the government included a copy of it in the appendix to its brief.

3

who have participated in this investigation and related investigations; and (c) review of documents connected with the investigation," he was aware of the following information: (1) on 13 July 2004, Alphatronx purchased APH-502 components from NG; (2) NG shipped the components to Piquet at Alphatronx on 6 August 2004; (3) on 12 August 2004, Ames exported APH-502 components to Ontime in Hong Kong; (4) on 14 September 2004, Alphatronx ordered APH-502 components from NG; (5) some time in October 2004, Joel Ames called Jane Sedaka at NG, introduced himself as an employee of Alphatronx in Florida, and inquired about the status of Alphatronx's 14 September 2004 order; (6) on 27 October 2004, NG shipped the components to Piquet at Alphatronx; (7) on 28 October 2004, Alphatronx made a Federal Express ("Fed Ex") shipment to Ames; and (8) on 30 October 2004, Ames exported APH-502 components to Ontime in Hong Kong. Appellee's Brief, Appx. at 15-23. Agent Blekicki indicated that unauthorized exportation of the components purchased by Alphatronx and shipped by Ames was prohibited by the Arms Export Control Act ("AECA"), 22 U.S.C. § 2778, and the International Emergency Economic Powers Act ("IEEPA"), 50 U.S.C. §§ 1701-1706, and that none of the parties involved in the transactions described in the affidavit had obtained the required export licenses from the DOS or DOC. Id. at 17-18, 24-26. Agent Blekicki concluded that,

4

[b]ased on the foregoing pattern of orders from Alphatronx/Piquet to NG, subsequent shipments from Alphatronx/Piquet to Joel Ames, P.C., and exports of the same items from Joel Ames, P.C. to Ontime Electech CO in Hong Kong, . . . there is probable cause to believe that located in the premises of Alphatronx will be evidence of violations of criminal offenses.

*Id.* at 26.

Piquet argued in his suppression motion that the affidavit was insufficient because it did not establish that the components Alphatronx purchased from NG were the same components that Ames shipped to China. R1-50 at 14-16. Piquet argued additionally that the affidavit lacked "sufficient attribution as to the source or sources of the information contained in the warrant." *Id.* at 2. Finally, Piquet argued that the evidence was not admissible under the "good faith exception" to the exclusionary rule because the warrant was so deficient on its face that the officers who executed it could not have reasonably relied upon it. *Id.* at 20-21.

Following a 5 November 2008 suppression hearing,[3] the magistrate judge issued a report and recommendation, finding that the sources of information cited in the affidavit, which included Agent Blekicki's conversations with other officers, were reliable, and that Agent Blekicki was not required to verify independently the facts related to him by other officers or to specifically attribute each fact alleged to

---

[3] Piquet offered no evidence or testimony at the suppression hearing, which was not transcribed. *See* R1-63 at 1, 3.

a particular source. R1-63 at 10. The magistrate judge then noted that the affidavit described a pattern of activity whereby Alphatronx, through Piquet, ordered restricted electronics from NG and, shortly thereafter, shipped similar or identical electronics to Ames, who then shipped similar or identical electronics to Hong Kong without the required licenses. *Id.* at 12. Inasmuch as the affidavit was based on reliable sources which established a link between Alphatronx's offices and the illegal exportation of electronic and military technology, the magistrate judge concluded that there was a fair probability that evidence of that criminal activity would be found at Alphatronx's offices. *Id.* at 11. The magistrate judge found alternatively that, even assuming the warrant was invalid, the seized evidence was admissible under *United States v. Leon*, 468 U.S. 897, 104 S. Ct. 3405 (1984), because the officers who conducted the search reasonably relied in good faith on the warrant. Id. at 13-14. The magistrate judge recommended that Piquet's motion to suppress be denied accordingly. *Id.* at 15. The district court overruled Piquet's objections and adopted the magistrate's report and recommendation. R1-67.

At trial, Albert F. Lawrence, an electrical engineer with NG for thirty years, testified that the APH-502 is a power amplifier designed for electronic warfare systems, such as control radars, missile radars, or "jamming type applications." R3 at 73-74, 76-77. Around 2003, the APH-502 was the "best part" available for

6

performance, and no other manufacturers, aside from NG, made a comparable component. *Id.* at 78. Lawrence was not aware of any civilian uses for the APH-502 and knew that there were restrictions on its sale and distribution. *Id.* at 80. The government then submitted into evidence a document, dated 13 February 2009 and signed by Robert S. Kovac, Managing Director of the DOS' Directorate of Defense Trade Controls, Bureau of Political-Military Affairs, certifying that the APH-502 is a defense article on the USML. White Binder, Exh. 709; R4 at 139. Attached to the certification was a form, dated 24 February 2009 and signed by Secretary of State Hillary Clinton, certifying Kovac's authority to make such a declaration. White Binder, Exh. 709. Bruce Charles Schwingler, division chief of DOS' Directorate of Defense Trade Controls, testified that a "technical review" by the Department of Defense indicated that the APH-502 was a defense article and that Kovac's certification was generated by his office. R4 at 127-28, 139. Schwingler further testified that a complete database search revealed no records of Piquet, AlphaTronx, Ontime, or Ames ever having applied for a license or authorization to export APH-502 electronic components to Hong Kong. *Id.* at 140-42; White Binder, Exh. 710.

At the close of the government's evidence, Piquet moved for judgments of acquittal on all counts of the indictment. He conceded that Schwingler's testimony

was credible, but argued that the certificate, dated February 2009, was insufficient to establish that the APH-502 was on the USML in 2004 and 2005. R5 at 90-91. The district court denied the motions, finding that the certificate in question was sufficient because it did not state that the APH-502 was on the USML *as of* 2009, but, rather, that the "APH-502 was on the list. Period." *Id.* at 92-94.

During the charge conference, Piquet requested a specific jury instruction that "a good faith mistake or belief is a complete defense" to the offenses charged. *Id.* at 116. The court declined to issue a full instruction on the defense of good faith, finding that Piquet had not raised such a defense, and instructed the jury on knowledge and willfulness as follows:

> The word knowingly, as the term is used in the indictment or in these instructions, means that the act was done voluntarily and intentionally and not because of mistake or accident.

> The word willfully, as that term is used in the indictment or in these instructions, means that the act was committed voluntarily and purposely with the specific intent to do something the law forbids; that is with bad purpose, either to disobey or disregard the law and not by mistake, accident or good faith.

> While the government must show that the defendant knew that his conduct was unlawful, the government does not necessarily have to show that the defendant was aware of the specific law or rule that his conduct may have violated. In other words, the government need not prove that the defendant had read, was aware of, or had consulted the United States munitions list, the Commerce Control list or the licensing provisions of the Arms Export Control Act, the International Traffic In Arms Regulations, the International Emergency Economic

8

Powers Act, or the Export Administration Regulations.

> The government, however, must prove beyond a reasonable
> doubt that the defendant knew, from whatever source, that a license
> was required.

*Id.* at 124; R6 at 14-15.

Piquet was found guilty on all counts and was sentenced to a term of sixty months of imprisonment. R2-106 at 1-3.

## II. DISCUSSION

Piquet challenges his convictions on three grounds: (1) the affidavit supporting the application for the search warrant of Alphatronx's offices was insufficient, rendering the warrant invalid, and, alternatively, the evidence was not admissible under *Leon*'s good-faith exception to the exclusionary rule; (2) the evidence was insufficient to prove that APH-502 was a defense article on the USML in 2004 and 2005, when the conduct alleged in the indictment occurred; and (3) the district court gave a confusing and contradictory jury instruction regarding "knowledge" and "willfulness" and erred by not giving an explicit instruction regarding his good faith defense. We address each argument in turn.

### A. Validity of the Search Warrant

When reviewing a district court's ruling on a motion to suppress, we review the court's factual findings for clear error and its application of the law to the facts

*de novo*, construing all facts in the light most favorable to the prevailing party. *United States v. Bervaldi*, 226 F.3d 1256, 1262 (11th Cir. 2000). We also must "give due weight to inferences drawn from those facts by resident judges and local law enforcement officers." *United States v. Jiminez*, 224 F.3d 1243, 1248 (11th Cir. 2000) (quotation marks and citation omitted).

The Fourth Amendment guarantees individuals "the right . . . to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. "This fundamental right is generally preserved by a requirement that searches be conducted pursuant to a warrant issued by an independent judicial officer upon a showing of probable cause." *United States v. Tamari*, 454 F.3d 1259, 1261 (11th Cir. 2006). Probable cause exists where the totality of the circumstances demonstrate a fair probability that contraband or evidence will be found at a particular location. *United States v. Brundidge*, 170 F.3d 1350, 1352 (11th Cir. 1999) (per curiam) (stating that a lower court's determination of probable cause is entitled to "great deference"). The affidavit in support of a search warrant should establish a connection between the defendant and the place to be searched as well as a connection between the place to be searched and the alleged criminal activity. *United States v. Martin*, 297 F.3d 1308, 1314 (11th Cir. 2002). Although "[o]bservations of fellow officers of the

10

Government engaged in a common investigation are plainly a reliable basis" for a search warrant, the agent must make clear to the magistrate judge that he is relying on other officers. *United States v. Kirk*, 781 F.2d 1498, 1505 (11th Cir. 1986). This requirement is satisfied where "the affidavit recites at the outset, or . . . it is clear from reading the affidavit as a whole, that it is based in part upon information obtained from other law enforcement officers." *Id.*

Piquet does not dispute the facts alleged in Agent Blekicki's affidavit, but asserts that they lacked specific attribution and failed to establish probable cause. We disagree. Agent Blekicki stated at the outset that the affidavit was based on personal observation, information from other agents involved in the investigation, and his review of investigation-related documents. That is all that was required. *See id.* Piquet argues additionally that the information provided by other officers did not provide a connection between Alphatronx and Hong Kong. A direct link between Piquet and Hong Kong was not required to establish probable cause to support a search of Alphatronx's offices, however, nor did the affidavit need to establish Piquet's knowledge of or level of involvement in Ames' illegal activity. Rather, the affidavit was sufficient because it provided a link between Piquet and Alphatronx's offices, as well as a link between Alphatronx's offices and the criminal activity alleged in the affidavit. *Martin*, 297 F.3d at 1314. Specifically, it

11

established that Alphatronx purchased electronic components from NG; that Ames made no purchases from NG; that Ames contacted NG about a pending Alphatronx order in October 2004, claiming to be an Alphatronx employee; and that Ames ultimately exported to China the same or similar electronic components as those Alphatronx purchased from NG and shipped to Ames. R1-63 at 5-8. Because the affidavit supporting the search warrant thus established a fair probability that evidence of the foregoing transactions and Ames' illegal exportation activities would be found at Alphatronx's offices, *see Brundidge*, 170 F.3d at 1352, we need not address Piquet's alternative argument under *Leon*. The district court did not err in denying Piquet's motion to quash and suppress.

B. *Sufficiency of the Evidence to Prove APH-502's inclusion on the United States Munitions List at the Time of the Offenses*

"We review the sufficiency of evidence to support a conviction *de novo*, viewing the evidence in the light most favorable to the government and drawing all reasonable inferences and credibility choices in favor of the jury's verdict." *United States v. Taylor*, 480 F.3d 1025, 1026 (11th Cir. 2007). "Our task . . . is limited to determining whether a reasonable jury could have found the defendants guilty on the basis of the evidence presented; our task is not to choose between competing interpretations of the evidence." *United States v. Jordan*, 582 F.3d 1239, 1247 (11th Cir. 2009) (per curiam). Accordingly, where the jury is "[p]resented with

12

two narratives, one tending to establish the defendant's guilt and another tending to establish innocence," the jury may "choose the account offered by the government." *Id.*

The USML, contained in regulations promulgated by DOS pursuant to the AECA, 22 U.S.C. § 2778 "consists of categories of defense articles that cannot be imported or exported without a license." *United States v. Fu Chin Chung*, 931 F.2d 43, 45 (11th Cir. 1991) (per curiam); *see* 22 C.F.R. § 121.1. "To sustain a conviction under 22 U.S.C. § 2778, the government must prove beyond a reasonable doubt that the defendant willfully exported or attempted to export defense articles that are on the United States Munitions List without a license." *United States v. Castro-Trevino*, 464 F.3d 536, 543 n.14 (5th Cir. 2006) (quotation marks and citation omitted). The government must therefore prove that the defense article was on the USML at the time of the alleged conduct. *See* 22 U.S.C. § 2778(b)(2).

Piquet's contention that the government failed to present sufficient evidence that APH-502 was a defense article on the USML in 2004 and 2005 is without merit. Director Kovac's certificate confirming the APH-502's inclusion on the USML, though dated 13 February 2009, does not state that the APH-502 was on the USML as of any particular date. As the district court pointed out, Director

13

Kovac's certificate states only that the APH-502 is on the USML. Given that the certificate did not specify any time-frame during which the APH-502 was on the USML, the jury could have interpreted the certificate to mean that the APH-502 was and always has been on the USML. *See Jordan*, 582 F.3d at 1247. Such a conclusion was reasonable, particularly in light of both Lawrence's testimony that the APH-502 was made exclusively for use during warfare and served no civilian purposes, and documentation accompanying purchase orders from Alphatronx to NG for APH-502 components in 2004 and 2005, submitted into evidence by the government, acknowledging that the APH-502 components "are controlled for export by the *International Traffic in Arms Regulations* (ITAR)" and "are not to be exported from the U.S. without first obtaining an export license from the U.S. Department of State." White Binder, Exhs. 224, 310, 329B. Viewing the evidence in the light most favorable to the government, it was sufficient to support the jury's finding that the APH-502 was a restricted defense article requiring an export license at the time of Piquet's conduct.

C. *The Jury Instruction on "Knowledge" and "Willfulness"*

"We review the legal correctness of a jury instruction *de novo*, . . . but defer to the district court on questions of phrasing absent an abuse of discretion. *United States v. Prather*, 205 F.3d 1265, 1270 (11th Cir. 2000) (citations omitted). A

14

court's refusal to give a requested jury instruction is reviewed for abuse of discretion. *United States v. Eckhardt*, 466 F.3d 938, 947 (11th Cir. 2006).

"Generally, district courts have broad discretion in formulating jury instructions provided that the charge as a whole accurately reflects the law and the facts, and we will not reverse a conviction on the basis of a jury charge unless the issues of law were presented inaccurately, or the charge improperly guided the jury in such a substantial way as to violate due process." *Prather*, 205 F.3d at 1270 (quotation marks and citation omitted). This is true even though parts of the jury instruction may be "confusing, technically imperfect, or otherwise subject to criticism." *United States v. Beasley*, 72 F.3d 1518, 1525 (11th Cir. 1996) (per curiam). The district court's refusal to give a particular jury instruction constitutes reversible error if the requested charge "(1) was correct, (2) was not substantially covered by the charge actually given, and (3) dealt with some point in the trial so important that failure to give the requested instruction seriously impaired the defendant's ability to conduct his defense." *Eckhardt*, 466 F.3d at 947-48.

Only "willful" violations of the AECA and regulations promulgated thereunder are subject to criminal sanctions. 22 U.S.C. § 2778(c); *see also United States v. Adames*, 878 F.2d 1374, 1377 (11th Cir. 1989) (per curiam). The "requirement of willfulness connotes a voluntary, intentional violation of a known

legal duty," and thus does not cover "innocent or negligent errors." *Adames*, 878 F.2d at 1377 (quotation marks and citation omitted). The government must prove specific intent for a substantive offense under § 2778, and any related conspiracy charge. *Id.* n.1.

The district court instructed the jury that, to secure a conviction, the government had to prove Piquet "knew, from whatever source, that a license was required" for the articles involved, and that he acted "voluntarily and purposely with specific intent to do something the law forbids" and not "by mistake, accident or good faith." R6 at 14-15. Piquet does not argue that this instruction was incorrect, but states that it was confusing in light of the court's earlier statement that the government need not prove Piquet was aware of or had read the particular statutes he violated. The instruction as a whole made clear, however, that the government was required to prove that Piquet was aware of the licensing requirements, from whatever source, even if he had not actually read the statutes and regulations at issue. We fail to see how this instruction, which accurately stated the law and the facts, prejudiced or confused the jury. *Beasley*, 72 F.3d at 1525 ("When the jury instructions, taken together, accurately express the law applicable to the case without confusing or prejudicing the jury, there is no reason for reversal . . . ").

16

We further find that the district court did not abuse its discretion in failing to give an explicit instruction regarding a good faith defense. The instruction the court did give, to wit, "[t]he word willfully. . . means that the act was committed . . . with bad purpose . . . and not by mistake, accident or good faith," R6 at 14-15, indicated that "mistake, accident, and good faith" were all valid defenses to the specific intent crimes with which Piquet was charged. The defense of good faith was thus adequately covered in the court's definition of willfulness, and the failure to give a separate instruction did not seriously impair Piquet's ability to conduct his defense. *See Eckhardt*, 466 F.3d at 947-48.

## III. CONCLUSION

Piquet appeals his convictions 22 U.S.C. § 2778 and 50 U.S.C. § 1705. For the foregoing reasons, we AFFIRM.

**AFFIRMED.**