In the
United States Court of Appeals
For the Seventh Circuit

No. 00-1254

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

v.

RANDY REYES,

Defendant-Appellant.

Appeal from the United States District Court
for the Eastern District of Wisconsin.
No. 98 CR 189--Charles N. Clevert, Judge.

Argued JANUARY 25, 2001--Decided November 7, 2001

Before COFFEY, RIPPLE and DIANE P. WOOD,
Circuit Judges.

COFFEY, Circuit Judge.  On October 22,
1999, a jury convicted Defendant-
Appellant Randy Reyes of crimes relating
to the illegal exportation of military
aircraft component parts destined for
Iran. Reyes was vice president of sales
and marketing for Siraj International,
Inc., a broker of commercial and military
aircraft component parts located in Oak
Creek, Wisconsin. Reyes was found guilty
of violating the Arms Export Control Act,
22 U.S.C. sec. 2778, and the
International Emergency Economic Powers
Act, 50 U.S.C. sec.sec. 1701-06, and he
was sentenced to serve two concurrent
prison terms of 41 months each followed
by two concurrent two-year terms of
supervised release. On appeal, Reyes
challenges the conduct of prosecutors,
the alleged inconsistency of the jury's
verdicts, the sufficiency of the
evidence, and the calculation of his
sentence. We affirm.

I.  BACKGROUND

A. The Arms Export Control Act and
International Emergency Economic Powers
Act

Section 38 of the Arms Export Control
Act (AECA), 22 U.S.C. sec. 2778, and its

attendant regulations, the International Traffic in Arms Regulations, 22 C.F.R. sec. 120-30, authorize the President of the United States ("President") to regulate and control the exportation of military and defense products through a licensing system administered by the State Department's Office of Defense Trade Controls. A license must be obtained before the export of any products or items designated as "defense articles" on the United States Munitions List. 22 C.F.R. sec. 121.1. Category VIII(h) of the Munitions List requires State Department licenses for the exportation of "components, parts, accessories, attachments and associated equipment" designed or modified for use on military aircraft. 22 C.F.R. sec. 121.1. Federal regulations also state that it is the policy of the United States to deny requests for licenses to export defense articles at any given time destined for certain specified countries, including Iran. 22 C.F.R. sec. 126.1(a).

On May 6, 1995, the President issued Executive Order 12959 pursuant to authority granted by the International Emergency Economic Powers Act (IEEPA), 50 U.S.C. sec.sec. 1701-1706./1 This order and its implementing regulations generally prohibit the exportation of any goods, technology or services from the United States to Iran without express authorization from the Office of Foreign Assets Control, a division of the Treasury Department. 31 C.F.R. sec.sec. 560.204, 560.501. This prohibition includes the exportation of any goods "to any person in a third country undertaken with knowledge or reason to know that such goods . . . are intended specifically for supply, transshipment, or reexportation, directly or indirectly, to Iran or the Government of Iran." 31 C.F.R. sec. 560.204(a).

B. Factual Background

The defendant Randy Reyes was employed by Siraj International ("Siraj"), a middleman/broker of aviation component parts--commercial and military, from October of 1996 until the spring of 1998. The principal actors at Siraj during the relevant time period were Reyes, the owner and president Jami Choudhury, and office manager Debra Martell. When an international customer placed an order

with Siraj, Reyes or Choudhury, depending on who had responsibility for the particular client, was responsible forassuring that all exports complied with the AECA and IEEPA./2 Shortly after Reyes was hired by Siraj in October, 1996, he made contact with a customer named Texam Holding, Ltd., located in Geneva, Switzerland, and operated by Mehrad Banimostafavi (a/k/a Michael Bani)./3 Reyes maintained Texam as his own client and handled virtually all transactions between Siraj and Texam.

At approximately the same time that Reyes made contact with Texam, another Milwaukee-area aircraft parts broker named International Aircraft Support Group (IASG) likewise began receiving orders from Texam. In January of 1997, Tina Bembenek (co-owner of IASG) received a purchase order from Texam requesting engine parts for an F-111 military aircraft, which in turn served to raise Bembenek's suspicion, for she was cognizant of the fact that only Iran and Australia flew the F-111. Bembenek called Bani (Texam) and inquired as to the end-user of the F-111 parts. According to Bembenek's testimony at trial, Bani told her that the parts were destined for Singapore. When confronted with Bembenek's statement that only Iran and Australia fly the F-111, Bani replied, "Let's send them to Australia."

In February, 1997, Bembenek was in Switzerland on unrelated business and arranged a meeting with Bani in Geneva. During this meeting Bani disclosed to Bembenek that he was an Iranian citizen living in Switzerland engaged in procuring military aircraft parts for Iran and at this time he provided Bembenek with a list of American companies with whom he did business. The list included Siraj International.

Upon Bembenek's return to the United States, she advised the U.S. Customs Service ("Customs") that Texam was acting as a front for Iran's procurement of military aircraft components. Thereafter Customs initiated an investigation into Texam and Bembenek agreed to assist in the investigation with the placing and receiving of telephone calls (recorded) with Bani and Reyes. In a recorded phone call to Reyes made on May 29, 1997, Bembenek informed him that she had

received correspondence from Bani stating that Texam intended to ship military aircraft parts purchased from her company (IASG) to Iran. Reyes responded, "Oh-oh, double no-no," indicating that he knew that sales of military equipment to Iran were prohibited by federal law. Reyes further displayed his knowledge of the law as he informed Bembenek at that time that all of his Siraj sale documents included a written stipulation that parts sold to Texam were destined for Texam's stock, and he suggested to Bembenek that she might make use of the same "stipulation" to protect herself, stating "the only thing I can suggest is . . . stipulate on your orders that this is going to your stock there in Geneva. . . ."

Approximately three weeks after this conversation with Bembenek, on June 16, 1997, Reyes shipped a number of "junction covers" and fuel flometer brackets to Texam in Geneva, Switzerland without first having obtained the required licensing permits from the State Department. These aircraft parts were contained on the Munitions List since they were designed for exclusive use on TF-30 military aircraft engines, which are used on F-111, A-7, and F-14 military aircraft. This shipment from Milwaukee to Switzerland was seized by U.S. Customs officials at JFK airport on June 20, 1997. About the same time, Milwaukee U.S. Customs agents executed a search warrant at Siraj's Oak Creek, Wisconsin offices and seized a number of documents relating to Siraj's business dealings with Texam. The Customs Agents also found numerous documents in Reyes' office at Siraj, including but not limited to pamphletsdetailing the State Department's registration and licensing process containing Reyes' handwritten notes, a partially completed draft of Siraj's registrant application containing Reyes' handwriting, and a copy of the Munitions List regulations with handwritten stars and checkmarks next to Category VIII (aircraft) and Category VIII(h) (aircraft component parts)./4 Contemporaneous with the Siraj raid, Special Customs Agent John Heyer interviewed Reyes while on the premises, and during the interview Reyes admitted that Texam was his client, that he was aware that the shipment of aircraft parts destined to Iran was prohibited by federal law, and when

questioned, further stated that Bani had informed him that the ultimate user of the airplane parts was either the Swiss Red Cross or Texam's stock. Contrary to his recorded telephone conversation with Bembenek of May 29, 1997, Reyes falsely stated to Heyer that he had never heard from any source that Texam supplied aircraft parts to Iran, and that he would not have exported any aircraft parts to Texam had he any reason to suspect that the parts were destined for Iran.

Upon the completion of the investigation, a grand jury on October 6, 1998 returned a five-count indictment against Reyes, Choudhury, Bani, and Siraj International, Inc. Count 1 charged all four defendants (the three individuals and the company) with conspiracy to violate the AECA and IEEPA by exporting Munitions List aircraft component parts from the United States destined for Iran without the necessary government licenses, contrary to 18 U.S.C. sec. 371. The conspiracy charge alleged three separate illegal shipments from Siraj to Texam in 1997, including the previously referred to shipment of June 16, 1997. Count 2 charged the same four defendants with willful violation of the AECA in connection with a January, 1997 shipment of military aircraft component parts from Siraj to Texam. Count 3 charged the four defendants with willful violation of the IEEPA in connection with a May, 1997 shipment from Siraj to Texam, and Counts 4 and 5 charged all the defendants with willful violations of the AECA and IEEPA in connection with the June 16, 1997 shipment from Siraj to Texam.

In March 1999, five months after return of the indictment and approximately nine months after Reyes voluntarily left Siraj, Ann Chiapetta purchased the assets of Siraj from Jami Choudhury and formed a new aircraft parts brokering business known as Avitek. Martell continued on as an employee of the new company until September 27, 1999, when Chiapetta discharged her./5

Two weeks prior to the commencement of the trial, Choudhury pled guilty to a charge of making a false statement to Agent Heyer on June 15, 1998, in violation of 18 U.S.C. sec. 1001, concerning his lack of knowledge that the aircraft parts Siraj sold to Texam were

destined for Iran. As part of its plea agreement with Choudhury, the government agreed to dismiss all charges in the indictment against Choudhury if he agreed to cooperate with the government in any subsequent investigation and testify truthfully in any trials relating to the subject matter of the indictment. Shortly before trial, the corporation (Siraj) changed its plea from one of not guilty to guilty to Counts 2 through 5 and Count 1 was dismissed.

Prosecutors met with Martell on October 4, 1999, as part of their preparation for Reyes' trial, to review the Siraj business documents the government intended to introduce in evidence. During that meeting, Martell volunteered information to the prosecutors that she had recently been discharged from Avitek, as well as making some "vague allegations" concerning alleged financial improprieties on the part of Choudhury and Chiapetta relating to the sale of Siraj's assets. The government did not disclose the information concerning Martell's vague allegations and suspicions to Reyes prior to trial./6

At Reyes' trial, Martell identified Siraj business documents, and she also gave testimony about the office procedures for telephone calls received from Texam (Reyes was the only employee authorized to speak to Bani), and that all faxes received from Texam were delivered to Reyes only, pursuant to his direction. With regard to her professional relationship with Reyes, Martell stated that she and Reyes on more than one occasion had disagreements regarding office procedures but in response to a question she also testified, "I wouldn't go that far to say that I didn't like him." Martell, when questioned about her termination from Avitek (formerly Siraj), stated that she did not "see eye to eye" with the new owner Ann Chiapetta.

On October 22, 1999, the jury returned guilty verdicts against Reyes on Counts 4 and 5 (violations of the AECA and IEEPA concerning the June 16, 1997 shipment), and acquitted Reyes on Counts 1, 2 and 3. After trial, Reyes filed a motion for judgment of acquittal, alleging insufficient evidence on Counts 4 and 5, and it was denied.

During the short time frame between Reyes' sentencing and the time he was to report to the Bureau of Prisons for assignment to an institution for confinement, he learned of Martell's allegations made to government agentsconcerning her suspicions of possible financial wrong-doing by Choudhury and Chiapetta in connection with the sale of Siraj. Reyes, armed with the newly disclosed statement of Martell's suspicions and vague allegations, filed a motion to stay the execution of his sentence pending the filing of a motion for a new trial or a petition for habeas corpus. He argued that the government should have disclosed the fact of Martell's discharge from Avitek and her vague suspicions of misconduct by Choudhury and Chiapetta, alleging that these facts would have provided Reyes with exculpatory evidence and/or an avenue for the impeachment of Martell's credibility at trial. The trial court denied his motion for a stay of sentence and again ordered him to report to the Bureau of Prisons. Reyes appeals.

II.  ISSUES PRESENTED

Reyes raises four issues on appeal. He alleges that: (1) the government's alleged failure to disclose any information concerning Martell's termination from Avitek and her suspicions of financial wrong-doing on the part of Choudhury and Chiapetta denied him exculpatory evidence or possible impeachment evidence in violation of his Fifth Amendment right to due process; (2) the guilty verdicts on Counts 4 and 5 should be reversed as inconsistent with his acquittal on Counts 1, 2 and 3; (3) the evidence to convict him on Counts 4 and 5 was insufficient; and (4) the district court committed error in sentencing him to a base level of 22.

III.  DISCUSSION

A. The Government's Alleged Failure to Disclose Information

Reyes contends that he is entitled to a new trial because the prosecution was obligated to disclose that: (1) Debra Martell had informed prosecutors of her suspicions of financial improprieties on

the part of Choudhury and Chiapetta related to the sale of Siraj; and (2) Debra Martell had been discharged from Avitek. Reyes argues that the government was required to disclose this information to the defense pursuant to Brady v. Maryland, 373 U.S. 83 (1963); see also United States v. Bagley, 473 U.S. 667 (1985); Kyles v. Whitley, 514 U.S. 419 (1995).

In Brady, the Supreme Court held that "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith of the prosecution." Brady, 373 U.S. at 87. The prosecution's obligation to disclose information extends to both exculpatory evidence and facts material to the impeachment of prosecution witnesses, and attaches even in the absence of a specific request by the defendant. United States v. Agurs, 427 U.S. 97, 110-11 (1976); United States v. Allain, 671 F.2d 248, 255 (7th Cir. 1982). Before the court can grant a motion for a new trial as a result of an alleged Brady violation, the moving party must establish that: (1) the prosecution suppressed evidence; (2) the evidence allegedly suppressed was favorable to the defense; and (3) the evidence was material to an issue at trial. Brady, 373 U.S. at 87; United States v. Walton, 217 F.3d 443, 450 (7th Cir. 2000).

Evidence is material to the defense if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A "reasonable probability" is that sufficient to undermine confidence in the outcome. The materiality standard is not met by "the mere possibility that an item of undisclosed information might have helped the defense, or might have affected the outcome of the trial . . . . Thus, Brady does not require a prosecutor to divulge every scintilla of evidence that might conceivably inure to a defendant's benefit.

Lieberman v. Washington, 128 F.3d 1085, 1092 (7th Cir. 1997) (citations omitted, emphasis added), quoting United States v. Hamilton, 107 F.3d 499, 509 (7th Cir. 1997).

Reyes, in a buckshot approach, attempts to gain a new trial by trying to link the two instances of alleged non-disclosure to the elements of Brady by speculating that had he known these facts prior to trial, he would have been able to cross-examine Martell more effectively and impeach her credibility as a witness by (1) supposedly being able to demonstrate that Martell's termination provided her with some type of motivation to retaliate against Reyes (despite the fact that Reyes had left the company approximately fifteen months before Martell's discharge); (2) establishing that Martell's accusations against Choudhury were made in retaliation for her discharge by Chiapetta; and (3) usingMartell's accusations against Choudhury to, in Reyes' words, "further explore the relationship between Choudhury and his employees."

Reyes' Brady claim concerning Martell's discharge fails because the information was not suppressed by the government, and in fact Martell specifically testified during trial about her termination. Throughout his appellate brief, Reyes insists that he had no way of knowing that Martell's employment had been terminated, but it is evident from a reading of the record that had Reyes paid closer attention during the trial (or scrutinized the transcript more closely prior to filing his appeal), he would have been aware of the following questions asked by the prosecution at trial and Martell's answers:

Q: When was the last day that you worked for Avetech [sic]?

A: The 27th of September.

Q: And why is it that you no longer work for Avitech [sic]?

A: I didn't get along with the new owner. She fired me. We didn't see eye to eye. I asked too many questions. (emphasis added)

Transcript p. 606.

"Brady does not require a prosecutor to divulge every scintilla of evidence that might conceivably inure to a defendant's benefit." Lieberman, 128 F.3d at 1092.

Furthermore, "this court has made clear that 'there is nothing in Brady or Agurs to require that such disclosures be made before trial.'" Allain, 671 F.2d at 255 (emphasis added). Due process is satisfied as long as the ultimate (albeit delayed) disclosure of Martell's termination was made "before it is too late for the defendant to make use of any benefits of the evidence." Id., quoting United States v. Ziperstein, 601 F.2d 281, 291 (7th Cir. 1979), cert. denied, 444 U.S. 1031 (1980). We are convinced that Reyes' Brady claim is without merit in as much as the very information he claims was suppressed (Martell's termination), is reflected in the record at trial. As a result, Reyes had ample opportunity to cross-examine Martell about any information regarding her termination from Avitek, but he failed to do so.

We turn now to Reyes' allegation that he was deprived of "favorable" information by the government's failure to disclose Martell's suspicions of vague financial misdealings between Chiapetta and Choudhury at the time of the Siraj-Avitek sale. In order for non-disclosed information to be considered "favorable" to the defense (the second element of the Brady test), the defendant must establish that the evidence is either exculpatory in nature or tends to impeach a prosecution witness. Kyles, 514 U.S. at 433; Agurs, 427 U.S. at 110. With regard to Reyes' argument as to the impeachment value of the alleged suppressed information, we note that Reyes had absolutely nothing to do with the decision to discharge Martell, much less anything to do with the sale of Siraj's assets to Chiapetta, because he left his employment with Siraj some nine months prior to the sale in March, 1999, and 15 months prior to Martell's discharge in September, 1999. Furthermore, Martell never alleged any misconduct on the part of Reyes and she testified that she harbored no hard feelings toward him. There is no link between Reyes and Martell's termination from Avitek, and we are of the opinion that there is no basis in this record to conclude that Martell's testimony was motivated by even a scintilla of ill will toward Reyes. The impeachment value of the alleged suppressed information is not supported by the record and Reyes' claim is without

merit.

Turning to the supposed exculpatory value of Martell's suspicions, Reyes speculates that had he been aware of her accusations, his cross-examination of Martell would have revealed significantly more about the manner in which Choudhury ran Siraj (including his supposed dealings with Texam) and the relationship between Choudhury and his employees. Reyes' argument is unconvincing because he worked with both Choudhury and Martell at Siraj for approximately 15 months, and he played an integral role at Siraj and was well aware of the business operations and business climate at the company. We thus fail to understand how Martell's vague allegations and suspicions could have provided Reyes with any knowledge he did not already possess concerning Choudhury's relationship with his employees, the manner in which Choudhury ran Siraj or his dealings with Texam, and other material aspects of the business climate at Siraj during all relevant times. If Choudhury or Martell had knowledge of facts potentially helpful to Reyes, Reyes was free to subpoena either or both of them before or during trial and call them as hostile witnesses and he failed to do so. Furthermore, exculpatory information is that which is "supportive of a claim of innocence" to the crimes charged. Agurs, 427 U.S. at 107. Martell's suspicions and allegations had nothing to do with proof of Reyes' criminal conduct as charged in the indictment, and thus we are convinced that the alleged suppressed information had no exculpatory value.

Our conclusion that the alleged suppressed information was not favorable to the defense (i.e., had no impeachment or exculpatory value) precludes any claim that disclosure (or earlier disclosure) of the information would have impacted the result of the trial. See Bagley, 473 U.S. at 682; Kyles, 514 U.S. at 433-34. Reyes' broad challenge to his conviction on the basis of the prosecution's alleged failure to comply with Brady is frivolous.


B. Inconsistent Verdicts

Reyes next argues that his convictions on Counts 4 and 5 of the indictment

should be reversed because they are inconsistent with his acquittal on Counts 1 through 3. Reyes contends that: (1) because he was found not guilty of the conspiracy charge (Count 1), the jury must have also found that the objectives of the conspiracy (the AECA and IEEPA violations) did not occur; and (2) because the jury acquitted on Counts 2 and 3 (the substantive AECA and IEEPA violations in connection with the January and May shipments to Texam), the jury was not convinced beyond a reasonable doubt that Reyes participated as an aider or abettor in the AECA and IEEPA violations related to the January and May shipments.

Inconsistent verdicts in a criminal case are not a basis for reversal of a conviction or the granting of a new trial. United States v. Powell, 469 U.S. 57 (1984); United States v. Muthana, 60 F.3d 1217, 1223 (7th Cir. 1995); United States v. Grier, 866 F.2d 908, 928 (7th Cir. 1989); United States v. Sims, 144 F.3d 1082, 1084 (7th Cir. 1998); United States v. Castillo, 148 F.3d 770, 774 (7th Cir. 1998). "When a jury returns inconsistent verdicts . . . it may do so for reasons other than a determination of innocence, such as mistake, compromise, or lenity," United States v. Nobles, 69 F.3d 172, 189 (7th Cir. 1995), and "a criminal defendant already is afforded protection against jury irrationality or error by the independent review of the sufficiency of the evidence undertaken by the trial and appellate courts." Powell, 469 U.S. at 66-67. Accordingly, we see no merit to Reyes' challenge to the supposedly inconsistent verdicts.

C. Sufficiency of the Evidence

Reyes next claims that the evidence presented at trial was insufficient to support his conviction on Counts 4 and 5 of the indictment. A challenge to the sufficiency of the evidence to support a conviction poses a "nearly insurmountable burden." United States v. Frazier, 213 F.3d 409, 415 (7th Cir. 2000). When reviewing a sufficiency of the evidence claim, "it is not our function to reweigh the evidence nor substitute our judgment for the decision of the jury," and we view "the evidence in the light most favorable to the prosecution, making all reasonable inferences in its favor, and will affirm the conviction so long as any

rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." United States v. Neville, 82 F.3d 750, 757 (7th Cir. 1996). This being a criminal case, we will reverse a conviction "only when the record is devoid of any evidence, regardless of how it is weighed, from which a jury could find guilt beyond a reasonable doubt." United States v. Garcia, 35 F.3d 1125, 1128 (7th Cir. 1994) (emphasis added).

1. Conviction on Count 4--Violation of the AECA

Count 4 charged that on or about June 16, 1997, Reyes "did knowingly and willfully export and attempt to export from the United States defense articles, that is, aircraft component parts which were designated as defense articles on the United States Munitions List, without having first obtained from the Department of State a license for such export . . . all in violation of Title 22, United States Code, Section 2778(b)(2) and (c)[.]" Conviction on this count required that the government prove beyond a reasonable doubt that Reyes willfully exported or attempted to export an item on the United States Munitions List without having first obtained a license. United States v. Beck, 615 F.2d 441, 449–50 (7th Cir. 1980).

At trial, the prosecution submitted a mountain of evidence to establish that Reyes was aware of his legal duty not to export Munitions List articles to Iran or any foreign country without a license. This evidence included expert testimony establishing that the aircraft parts Reyes attempted to export were designed exclusively for use on a TF-30 military aircraft engine (which is used on F-111 and F-14 military aircraft), as well as many documents (several with Reyes' handwritten notes on them) seized from Reyes' private office, that helped to establish Reyes' knowledge of the Munitions List and the law restricting exports of items on that list./7 The evidence also included the tape-recorded phone conversation between Reyes and Bembenek in which Reyes explicitly acknowledges both the illegality of shipping to Iran without a license and his awareness of the fact that Texam was shipping the parts it ordered to Iran.

This combination of direct and circumstantial evidence was overwhelming and obviously more than sufficient to convict Reyes of Count 4 of the indictment. "Circumstantial evidence is of equal probative value to direct evidence," United States v. Vega, 860 F.2d 779, 793 (7th Cir. 1988), and "in some cases it is even more reliable." United States v. Ranum, 96 F.3d 1020, 1026 (7th Cir. 1996). "Not only is the use of circumstantial evidence permissible, but circumstantial evidence 'may be the sole support for a conviction.'" Vega, 860 F.2d at 793-94.

All of the material seized from Reyes' office, combined with the recorded conversation with Bembenek, and Agent Heyer's testimony that during his interview Reyes (1) admitted knowing that the shipment of aircraft parts destined for Iran was prohibited by federal law; and (2) acknowledged that he was aware that Siraj had registered with the State Department for eligibility to obtain Munitions List export licenses, provided more than a sufficient basis for the jury to conclude that the defendant was aware that he had to ascertain whether an aircraft component part was on the Munitions List. The evidence also overwhelmingly demonstrated his awareness of the requirement to obtain a license prior to exporting any aircraft part on the Munitions List. Reyes' obvious disregard for his known legal duties in attempting to export items on the Munitions List without a license, provided more than sufficient grounds for the jury's finding of a willful violation of the AECA. We thus hold that the evidence was sufficient to convict the defendant of Count 4 of the indictment.

### 2. Conviction on Count 5--Violation of the IEEPA

Count 5 of the indictment charged that on or about June 16, 1997, Reyes "did knowingly and willfully export and attempt to export from the United States to Iran through Geneva, Switzerland, certain goods, namely aircraft component parts . . . all in violation of Title 50, United States Code, Section 1705(b), 18 U.S.C. sec. 2, 31 C.F.R. sec.sec. 560.203, 560.204, and Executive Orders 12957 and 12959." The government was

required to establish that Reyes willfully attempted to export goods to another country, knowing the ultimate destination was an embargoed country, without a license. 50 U.S.C. sec. 1705(b); 31 C.F.R. sec. 560.203-204, issued pursuant to Executive Order 12959, sec. 1(b) and 1(g), 60 Fed. Reg. 24757, 15 C.F.R. sec. 785.4(b)(2), 15 C.F.R. sec. 787.5(b).

Reyes contends that the government failed to present sufficient evidence to establish his knowledge that the June 16, 1997 shipment to Texam was destined for Iran, but his argument ignores the substantial evidence presented by the prosecution. During Agent Heyer's interview with Reyes on June 19, 1997, he acknowledged that he was aware of the illegality of shipping parts to a customer who in turn forwarded them to an Iranian destination, and he falsely stated that he had never been told by anyone, and had no reason to suspect, that shipments sent to Texam Holding were subsequently being forwarded to Iran. The government also introduced a document faxed to Siraj on March 3, 1997, from Texam's Swiss bank, bearing the notation "F/A Iran Aircraft Industries, Tehran, Texam Holding Ltd., Geneva," and referencing Texam's payment for a shipment to Texam. Another damaging piece of evidence introduced against the defendant was a fax from Texam to its Swiss bank (and on which Siraj was copied) dated May 19, 1997, containing a "re" line reading "Air shipment from Geneva/ Switzerland to Tehran/Iran." The government also offered evidence through the use of expert computer forensics testimony demonstrating that the fax machine at Siraj received two faxes in December, 1996, (again from Texam to its Swiss bank and on which Siraj had been copied) containing a "re" line stating "Air shipment from Geneva/Switzerland to Tehran/Iran." Further, Debra Martell testified that Texam was Reyes' personal client, that he was the only Siraj employee authorized to speak on the telephone with Bani, and, importantly, that all incoming faxes from Texam were to be delivered to and handled exclusively by Reyes.

Viewed in the light most favorable to the government, and making all reasonable inferences in its favor, Neville, 82 F.3d

at 757, we hold that when considering the totality of the evidence offered by the prosecution, it was sufficient for the jury to find that Reyes attempted to export parts to Texam without a license and that he had knowledge that the aircraft parts would be forwarded to Iran, in violation of the IEEPA. Reyes' challenge to the sufficiency of the evidence supporting his conviction on Count 5 of the indictment is without merit.

## D. Calculation of Base Level

Reyes' final challenge involves the calculation of his base level under the United States Sentencing Guidelines. The district court, in sentencing Reyes for his conviction on Count 4 of the indictment (violation of the AECA), applied U.S.S.G. sec. 2M5.2(a)(1), which provides for a base level of 22 for all violations of 28 U.S.C. sec. 2778 (the AECA). The only exception permitted by the guidelines is that instance in which a defendant's conviction for violation of the AECA "involved only non-fully automatic small arms (rifles, handguns, or shotguns), and the number of weapons did not exceed ten," in which case the base level should be set at 14. U.S.S.G. sec. 2M5.2(a)(2).

Reyes advances a plethora of arguments in support of his proposition that his base level should have been set at 14. Reyes' self-serving ideas about the seriousness of his crimes are more properly addressed to the U.S. Congress and the U.S. Sentencing Commission. It is the Sentencing Commission's duty to recommend the proper guidelines and forward them to Congress for the enactment of legislation, and Reyes' biased opinion dealing with the "seriousness" of his crime is of absolutely no import because it is irrelevant under the plain language of the Guideline. Congress has established a base level for violations of the AECA in U.S.S.G. sec. 2M5.2(a)(1) and (2). The Guidelines are clear and unambiguous, and the trial judge did not err in setting Reyes' base offense level at 22.

The judgment and sentence of the district court are AFFIRMED.

FOOTNOTES

/1 The IEEPA, with certain exceptions not pertinent here, gives the U.S. President authority to regulate or prohibit exports and other transactions in response to certain national security situations. See 50 U.S.C. sec.sec. 1701, 1702.

/2 In March, 1997, Siraj registered with the State Department as an exporter of defense articles, in order that they might obtain export licenses for certain items on the Munitions List. 22 C.F.R. sec. 122.1(c).

/3 Bani was also charged in the indictment but to date has failed to submit to the court's jurisdiction.

/4 Debra Martell, in identifying Reyes' handwriting at trial, stated (without objection) that she was familiar with Reyes' handwriting and that the handwriting on these documents was his.

/5 Martell's firing on September 27, 1999, occurred but two weeks before Reyes' trial.

/6 The record discloses that the government did not conduct any investigation into Martell's vague allegations concerning the sale of Siraj until at least five weeks after the completion of Reyes' trial (November, 1999).

/7 The documents introduced in evidence included those detailed in part I.B of this opinion, and additionally: (1) phone message notes in Reyes' handwriting referencing "foreign military sales," "defense trade controls," and the phone numbers of State Department employees; (2) a list of aircraft parts contained in the Siraj warehouse that included the type of aircraft that used each part; and (3) a price quotation from a Siraj supplier, addressed to Reyes, containing the notation "proof of U.S. Government State Department license must be provided prior to acceptance and processing of any resulting order."