[PUBLISH]

In the

# United States Court of Appeals

### For the Eleventh Circuit

_____

No. 22-10256

_____

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

*versus*

PETER SOTIS,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Southern District of Florida
D.C. Docket No. 1:19-cr-20693-PAS-1

_____

2                    Opinion of the Court                    22-10256

Before WILLIAM PRYOR, Chief Judge, MARCUS, Circuit Judge, and MIZELLE,* District Judge.

MIZELLE, District Judge:

For the better part of three decades until its rescission in 2006, the State Department designated Libya as a State Sponsor of Terrorism. *See* U.S. Dep't of State, *Country Reports on Terrorism 2006, Chapter 3: State Sponsors of Terrorism Overview* (Apr. 30, 2007), https://perma.cc/4N76-PFAN. As of today, the Department advises United States citizens not to travel to Libya "due to crime, terrorism, civil unrest, kidnapping, and armed conflict." U.S. Dep't of State, *Libya Travel Advisory* (emphases omitted), https://perma.cc/D4GA-5S5P (July 13, 2023). And Libya has been subject to a United Nations Security Council Arms Embargo since February 2011. *See* S.C. Res. 1970 (Feb. 26, 2011). Perhaps unsurprisingly, the Department of Commerce requires a license to export certain products to Libya that implicate the United States' national security interests. *See* 15 C.F.R. Pt. 738, Supp. No. 1.

This appeal involves Peter Sotis's convictions for subverting that licensing requirement. It presents three issues. First, Sotis challenges the sufficiency of the evidence to support each count of his conviction: (1) conspiracy to violate export controls; (2) export and attempted export of a Commerce Control List item to Libya without a license; and (3) smuggling. Second, Sotis claims that opinion

---

* Honorable Kathryn Kimball Mizelle, United States District Judge for the Middle District of Florida, sitting by designation.

testimony presented at trial invaded the province of the jury. And third, Sotis argues that his 57-month sentence was unreasonable. Because these arguments lack merit, we affirm.

## I. BACKGROUND

We begin with a review of the statutory background, followed by the facts and the procedural history.

### A. *Statutory Background*

Under the Export Administration Act (EAA), the Department of Commerce's Bureau of Industry and Security promulgated the Export Administration Regulations (EAR) governing the export of certain types of products. *See* 50 App. U.S.C. §§ 4601–23; 15 C.F.R. § 730.2. These regulations are "intended to serve the national security, foreign policy, nonproliferation of weapons of mass destruction, and other interests of the United States." 15 C.F.R. § 730.6. The International Emergency Economic Powers Act (IEEPA) "also authorizes the President to issue regulations governing exports." *United States v. Singer*, 963 F.3d 1144, 1149 (11th Cir. 2020). Since the EAA lapsed in 2001, every President has taken executive action under the IEEPA to order that the EAR remain in effect. *Id.* at 1149–50; *see, e.g.*, Continuation of the National Emergency With Respect to Export Control Regulations, 88 Fed. Reg. 55,549 (Aug. 16, 2023). Thus, it is a felony under the IEEPA to willfully violate, attempt to violate, or conspire to violate the EAR. *See* 50 U.S.C. § 1705(a), (c).

In part, the EAR controls the export of "dual use" items, *see* 15 C.F.R. § 730.3—items that have both military and civilian

applications—because such items "could make a significant contribution to the military potential of other nations" or "could be detrimental to the foreign policy or national security of the United States," *Singer*, 963 F.3d at 1150. As such, the Department of Commerce generally requires a license to ship any dual use item abroad. *See* 15 C.F.R. § 730.3. Commerce lists "the most sensitive items subject to EAR controls on the Commerce Control List." *Singer*, 963 F.3d at 1150; *see* 15 C.F.R. Pt. 774, Supp. No. 1. (Commerce Control List). Each listed item receives an Export Classification Number that corresponds to a set of requirements for shipping abroad, cross-referenced with a chart of potential foreign destinations. *Singer*, 963 F.3d at 1150; 15 C.F.R. § 732.3(d); *id*. Pt. 738, Supp. No. 1 (Commerce Country Chart).

When a person seeks to export a product subject to the EAR, Commerce must determine whether the exporter needs and should receive a license to export the product. Relevant to this appeal, "[m]arine systems, equipment, 'parts,' and 'components'" are listed on the Commerce Control List under Classification Number 8A002 and require a license to export to Libya for national security and antiterrorism reasons. *See* 15 C.F.R. Pt. 774, Supp. No. 1, Cat. 8 (Commerce Control List); *id*. Pt. 738, Supp. No. 1 (Commerce Country Chart). Specifically, a license is required to export "[c]losed circuit rebreathers" and "[s]emi-closed circuit rebreathers" to Libya unless the individual rebreather is intended for personal use and accompanied by its end user. *Id*. Pt. 774, Supp. No. 1, Cat. 8 (Commerce Control List).

### B. Factual Background

Sotis was the majority shareholder of Add Helium, LLC, a Fort Lauderdale company that sold and exported diving equipment and provided diving training. Sotis owned Add Helium together with minority shareholder Shawn Robotka, but Sotis handled day-to-day operations as managing member. Emilie Voissem also worked at Add Helium, serving as a manager and Sotis's "right-hand person."

In April 2016, Osama Bensadik, a Libyan national, contacted Sotis seeking to purchase four rEvo III rebreathers and other diving equipment as well as training in their use. Bensadik indicated that he intended to use the equipment to train Arabic-speaking users in Libya in association with his company, CODI Group. Bensadik asked Add Helium to coordinate with Mohammad and Diana Zaghab, owners of a Virginia export company, to ship the goods to Libya. This "very large order" totaled over $100,000, and Sotis instructed his employees to get the order together "asap." Sotis explained that there was "nothing casual about completing this order" and he expected that if Add Helium did a good job, "this is just the beginning of what [Bensadik] will order." Sotis also instructed that he wanted "to be kept in the loop about anything that has been ordered that is being delayed by a manufacturer for any reason what-so-ever," stating that "[i]f there is any delay I want to know about it so I can get involved and help it along."

On July 27, 2016, after receiving and packaging the items for shipment, Voissem contacted Add Helium's usual shipping

company to coordinate pickup. The same day, a representative from the shipping company informed Voissem that "[t]his shipment to Libya might be more complicated than originally thought," and instructed Voissem to reach out to Commerce and the State Department "to see if [Add Helium] need[ed] any special license to ship" because "Libya is on [a] restricted list."

Voissem then contacted the Zaghabs to let them know that there would be a problem with shipping because Add Helium's shipping company had "put an alert on [the shipment] due to the items [it contained] and that it was going to Libya." Diana Zaghab told Voissem that Commerce would require a license for shipment for items "considered sensitive, high technology," and asked whether Add Helium's rebreathers could be classified as such or if they could "be deemed as dual use." Voissem replied that "[t]he products being shipped are considered by us to be recreational/technical diving equipment." Voissem also explained that she had contacted a federal agent at Commerce who directed her to the Bureau of Industry and Security. The Commerce agent told Voissem, which she later conveyed to Sotis, "that shipping to Libya was probably not going to happen."

Around the same time, Voissem informed Sotis that the shipping company had told her that there were some "red flags" with the shipment. She relayed that "due to the current state of affairs each item has to be approved and allowed to be shipped" and that it was Add Helium's "responsibility to clear the items with the Department of Commerce." Sotis instructed Voissem to "look

into the [D]epartment of [C]ommerce requirements" to "see how time consuming it might be" before making a determination on how to proceed. Later, he instructed Voissem to "let Mohamm[a]d [Zaghab] know" if contacting Commerce "turn[ed] into too much of a problem."

Afraid that Sotis would be "very upset with her" about being unable to ship, Voissem approached Robotka with her concerns. Robotka told Voissem that he did not think Add Helium could complete the shipment because the federal government viewed re-breathers as "hav[ing] a distinctive military application." He also sent her a link to an Executive Order banning shipments to Libya. Voissem alerted Sotis to the Executive Order in a subsequent email where she also conveyed the message she had received from Commerce: "that shipping to Libya was probably not going to happen." Sotis replied that the Zaghabs were "going to have to find another route or handle [the shipment] from here" because Add Helium did "not need trouble from the government for making an illegal shipment." Sotis instructed Voissem to let Bensadik and the Zaghabs "manage this problem" and to have them inform Add Helium "how they intend to receive their goods" since Add Helium could not ship to Libya. Acting on this understanding, Voissem agreed with Mohammad Zaghab that the Zaghabs' shipping firm would handle the shipment instead of Add Helium's usual partner.

On August 4, a different Commerce official—Special Agent Brent Wagner—visited Add Helium to meet with Robotka, Voissem, and Voissem's assistant to discuss the Libya shipment.

Although Sotis knew about the meeting, he was "very adamant" that he would not attend, instead arranging to be teaching a class elsewhere. Wagner delivered a presentation on export control law to the Add Helium employees in attendance, including Robotka and Voissem, and specifically noted that an exporter cannot try to circumvent the regulations by "just having somebody else do the shipping." Wagner explained that Add Helium needed a license determination and potentially a license from Commerce before shipping the rebreathers and advised that they were unlikely to receive a license due to the rebreathers' military application. He also agreed to apply for an expedited license determination on Add Helium's behalf and instructed the meeting participants that the shipment "was detained," needed to "stay on the property," and could not "go anywhere" until the licensing issue was resolved.

Robotka briefed Sotis on the meeting later that day and informed him that Add Helium "could not release the shipment" and would have to wait for a license determination before the rebreathers could leave the warehouse. Sotis asked whether Add Helium could "ship somewhere else," and Robotka explained that doing so would also be illegal. Despite that knowledge, Sotis instructed Voissem not to tell the Zaghabs about the meeting with Wagner. Sotis instead called Mohammad Zaghab and told him that a Commerce agent came and "looked at the merchandise" but that the agent "didn't say anything" or discuss the shipment with Add Helium's employees. Sotis did not mention the licensing requirements or the possibility that the rebreathers could have a military

application, and Mohammad was left with the impression that Commerce's visit was nothing more than a random inspection.

On August 9, Voissem gave the shipment to a local transportation company that the Zaghabs had hired. The shipment would not have left Add Helium's warehouse without Sotis's approval. After picking up the shipment, the Zaghabs' shipping company transported it to Miami, where it was flown out en route to Libya.

On August 17, Wagner called Add Helium and informed Sotis and Voissem that Commerce had preliminarily determined that Add Helium needed a license to ship the rebreathers to Libya and that "the shipment was going to be seized." Neither Sotis nor Voissem told Wagner that the rebreathers had already been shipped. On August 24, Wagner met with Voissem and Robotka in person at Add Helium and again explained that they could not ship the rebreathers without a license. Toward the end of the meeting, Sotis joined the group and took Wagner and Voissem to his office, where he informed Wagner that the shipment was already en route to Libya. Wagner told Sotis to get the shipment back, but Sotis said there was nothing he could do. Wagner, however, was eventually able to divert the shipment to Miami where the rebreathers were seized.

After the federal investigation began, Sotis and Robotka's relationship deteriorated, resulting in Sotis locking Robotka out of the company and Robotka suing Sotis in state court for breach of contract. Sotis also threatened to kill Robotka if he cooperated with the investigation. Eventually, the federal government charged

Voissem and Sotis. But it did not charge the Zaghabs after determining that they "had no idea what was going on."

*C. Procedural History*

On October 24, 2019, the government indicted Voissem and Sotis for conspiracy to violate the IEEPA and the EAR in violation of 18 U.S.C. § 371; export and attempted export of a Commerce Control List item to Libya without a license in violation of 50 U.S.C. § 1705(a) and (c), 18 U.S.C. § 2, and 15 C.F.R. § 764.2; and smuggling in violation of 18 U.S.C. §§ 2, 554(a).

At trial, Sotis did not contest that the rEvo III rebreathers required a license to ship to Libya or that he did not obtain a license for them. The government called witnesses including Wagner, Michael Tu (a senior engineer at Commerce who made the initial licensing determination for the shipment), and Robotka.

Wagner testified to his interactions with Sotis and Voissem. On cross examination, Voissem's counsel asked Wagner whether civil penalties were an option he could have pursued instead of criminal penalties. On re-direct, the government asked whether Wagner had seen a case with "this level of willfulness." Sotis objected, but only to Wagner's comparison to previous cases. The district court overruled the objection but later took up the matter with counsel. The district court explained that it had expected an objection to Wagner's testimony about willfulness beyond the comparison issue, but ultimately did not take any further action.

Tu, the Commerce official responsible for determining whether Add Helium needed a license to ship the rebreathers to

Libya, testified that he had determined that it did and informed Wagner as such. Explaining the technology at issue, Tu testified that a closed-circuit rebreather is a "device that a diver will use that will not produce any bubbles [when] the diver exhale[s]," and that a semi-closed-circuit rebreather "operate[s] under similar principles" but releases "some exhalation gases." Robotka testified, based on his experience as a diver and partial owner of Add Helium, that rEvo III rebreathers "don't put out any bubbles" except perhaps "on the ascent."

Sotis moved for a directed verdict at the close of the government's case, arguing that there was insufficient evidence to convict on each count and claiming that Wagner and Robotka were not credible witnesses. The district court denied the motion because credibility issues were properly for the jury to decide. The jury later found Sotis guilty of all three counts.

The draft presentence investigation report calculated Sotis's advisory sentencing range to be 121 to 151 months based on his criminal history category of I and a total offense level of 32. The Probation Office based its calculation on United States Sentencing Guidelines Manual § 2M5.2(a)(1) (Nov. 2018). The report also recommended a two-level enhancement for obstruction of justice and a four-level enhancement for Sotis's leadership role.

Sotis made a number of objections to the report at his sentencing: (1) to language in the report stating that rEvo III rebreathers have an adaptive military use; (2) to the use of § 2M5.2 to determine his base offense level; (3) to the failure to grant a downward

departure to level 14 based on § 2M5.2 Application Notes 1 and 2; (4) to the four-level enhancement based on his alleged leadership role; and (5) to the two-level enhancement for obstruction of justice based on his alleged threat to Robotka. Sotis argued that the most appropriate guideline was § 2B1.1, which pertains to fraud crimes. The government responded that, if the court concluded that § 2M5.2 was not the most appropriate guideline, Sotis should be sentenced under § 2M5.1(a)(1) instead of § 2B1.1.

The district court held a two-day sentencing hearing, during which it ultimately agreed with the presentence investigation report that § 2M5.2(a)(1) was the most appropriate guideline over Sotis's renewed objection. The court departed downward five levels to 21 based on Application Note 2, which contemplates a departure based on "the degree to which the violation threatened a security or foreign policy interest of the United States, the volume of commerce involved, the extent of planning or sophistication, and whether there were multiple occurrences." U.S.S.G. § 2M5.2, cmt. n.2. The district court reasoned that "there was no evidence at trial as to the degree to which . . . this violation threatened a specific security or foreign policy interest of the United States"; the company "did not actively recruit a marketing scheme to sell [rebreathers to] Libya"; and that the sale represented "a hope of future business" constituting, "at best, an ad hoc plan[]" that resulted in a "one time" sale. The court overruled Sotis's objections and applied a two-level obstruction enhancement and a two-level leadership enhancement, which brought his total base offense level to 25 and resulted in a guidelines range of 57 to 71 months. Sotis objected to the court's

refusal to depart downward further under Application Note 2. The court imposed a sentence of 57 months followed by three years of supervised release.

## II. STANDARDS OF REVIEW

We review sufficiency of the evidence claims *de novo*, viewing the evidence in the light most favorable to the jury's verdict, and "will affirm if a reasonable jury could find that the evidence demonstrates the defendant's guilt beyond a reasonable doubt." *Singer*, 963 F.3d at 1155. The same standard applies to the question of whether a material variance occurred between the indictment's allegations and the evidence presented at trial. *United States v. Goldstein*, 989 F.3d 1178, 1198 (11th Cir. 2021). In that context, we will affirm if "viewing the evidence in the light most favorable to the government as we must do in all sufficiency claims, . . . a reasonable jury could have determined beyond a reasonable doubt" that there was no variance and substantial evidence supports that determination. *United States v. Calderon*, 127 F.3d 1314, 1327 (11th Cir. 1997). "[I]f . . . there is a material variance, we then determine whether any substantial prejudice resulted to the defendant[]." *Id.*

Unpreserved claims that a witness invaded the province of the jury are reviewed only for plain error. *See United States v. Margarita Garcia*, 906 F.3d 1255, 1263 (11th Cir. 2018).

As for sentencing challenges, we review *de novo* whether the district court applied the correct provision under the Guidelines. *United States v. Belfast*, 611 F.3d 783, 823 (11th Cir. 2010). When the legal question of which guideline is correct is fact-bound, we

review only for clear error. *Id.* "Applying this standard, we will not find clear error unless our review of the record leaves us with the definite and firm conviction that a mistake has been committed." *United States v. White*, 335 F.3d 1314, 1319 (11th Cir. 2003) (alterations accepted) (quotations omitted). Finally, we review the substantive reasonableness of a criminal sentence for abuse of discretion, considering the totality of the circumstances. *United States v. Docampo*, 573 F.3d 1091, 1096, 1101 (11th Cir. 2009).

### III. DISCUSSION

We address the issues on appeal in three general categories: (1) sufficiency of the evidence; (2) improper opinion testimony; and (3) sentencing.

### A. Sufficiency of the Evidence

Sotis advances three sufficiency arguments. He first claims that the evidence was insufficient to prove willfulness. Second, he contends that the evidence was insufficient to prove that he participated in a conspiracy with Voissem. Third, he argues that the government charged but failed to prove through sufficient evidence that the rEvo III rebreathers were closed circuit, resulting in a material and prejudicial variance from the indictment. Sotis made some of these objections at trial and raises others for the first time on appeal. None are availing, even under *de novo* review.

### 1. Willfulness

Sotis first argues that there was insufficient evidence for the jury to find that he acted willfully. Because he had "actual

knowledge" that "the rEvo IIIs had been rejected for military application," Sotis says, he did not realize the rebreathers could be considered dual use or controlled for export under the EAR. Instead, Sotis claims that it was the Zaghabs' responsibility to investigate and obtain any necessary license. To this end, Sotis offers a detailed timeline that he says shows his and Voissem's reliance on Diana Zaghab's communications with them that the shipment did not require a license. This theory amounts to an argument that Add Helium's emails with the Zaghabs demonstrate a good faith effort to follow the law, not willful disregard of it. We disagree.

To prove a felony violation of the IEEPA and the EAR, the government needed to present evidence that Sotis willfully caused or attempted to cause the export of an item on the Commerce Control List for which he failed to obtain a license. 50 U.S.C. § 1705(a), (c). To prove willfulness under the IEEPA, "the government need not directly demonstrate that the defendant knew the facts that made his conduct a violation of the law." *Singer*, 963 F.3d at 1158 (emphasis omitted). Instead, prosecutors "may present evidence that [the United States] engaged in 'affirmative efforts' to warn the defendant of the regulatory requirement he later violated or that the defendant's conduct indicated that he knew of the fact that a regulation or statute prohibited his conduct at the time he engaged in it." *Id.*

The government furnished such evidence by introducing emails from Voissem telling Sotis that it was Add Helium's responsibility to make sure the shipment complied with Commerce's

export control regime. Wagner's testimony that he instructed Voissem and other Add Helium employees that the shipment could not leave the warehouse until Commerce made a licensing determination was further proof of scienter. And the evidence was sufficient for a reasonable jury to find that Sotis knew he would still violate the EAR by shipping through an intermediary because Robotka told Sotis after meeting with Wagner that doing exactly that would be illegal. The jury could also infer from Sotis's email to Voissem stating that the company did "not need trouble from the government for making an illegal shipment" that he was more than aware of Add Helium's legal jeopardy but decided to ship the rebreathers anyway.

Sotis's attempt to shift blame to the Zaghabs fails. Sotis argues that he and Voissem delegated the licensing determination to the Zaghabs, and that the rebreathers were shipped because the Zaghabs made a mistake. But as the government rightly responds, the Zaghabs lacked the requisite mens rea *because* Sotis and Voissem intentionally kept them in the dark about the instructions Commerce had given about the shipment. If Sotis and Voissem had truly delegated the licensing determination to the Zaghabs, they would have kept them apprised of Commerce's communications. Instead, Sotis lied to Mohammad Zaghab when he told him that Commerce "didn't say anything" about a license determination for the rebreathers. That deliberate omission left the Zaghabs with the impression that Wagner's visit had been a random search, of no importance to whether the rebreathers required an export license to be shipped to Libya. Viewing this evidence in any light, much

less the light most favorable to the government, a reasonable jury could have found that Sotis had sufficient knowledge of the illegality of his conduct to have willfully violated the export control laws. *See, e.g.*, *United States v. Maurya*, 25 F.4th 829, 841–42 (11th Cir. 2022).

### 2. Conspiracy

Next, Sotis argues that the evidence was insufficient to prove that he and Voissem acted in conspiracy. To prove conspiracy, the government needed to prove that Sotis knew of the unlawful plan, willingly joined in it, and committed at least one overt act to carry out the agreement. 18 U.S.C. § 371; *see United States v. Adkinson*, 158 F.3d 1147, 1153 (11th Cir. 1998).

As previously explained, the government presented sufficient evidence that Sotis knew it was illegal to export the rebreathers without approval from Commerce, even if he used a third party to complete the shipment. The government also presented sufficient evidence that Sotis willingly joined Voissem in shipping the rebreathers despite government warnings because the record proves that he instructed Voissem to have the Zaghabs take over shipping. Sotis further instructed Voissem not to tell the Zaghabs about the licensing requirements. Robotka testified that the rebreathers would not have left Add Helium's warehouse without Sotis's approval. And Sotis attempted to conceal that fact by failing to inform Wagner that the shipment was on its way to Libya when Wagner contacted Add Helium on August 17. Viewing this evidence in the light most favorable to the verdict, the government

sufficiently proved that Sotis conspired with Voissem to violate the export control laws.

### 3. Closed-Circuit Rebreathers

Finally, Sotis argues that there was insufficient evidence to convict him because the government failed to prove that the rEvo III rebreathers he exported were closed-circuit rebreathers as alleged in the indictment. Sotis claims that this failure prejudiced him because some types of rebreathers are not controlled for export to Libya. He largely points to evidence presented at sentencing to claim that rEvo III rebreathers were rejected for military use and thus could not have been controlled for export. Sotis further contends that the government failed to prove that the shipment of rebreathers was directed to a dangerous person to be used for a dangerous purpose. This series of arguments boils down to a contention that the evidence at trial was a "material variance" from the allegations in the indictment, resulting in substantial prejudice.

The indictment states, in relevant part, that "[a] rebreather . . . absorbs the carbon dioxide of a scuba diver's exhaled breath to permit the rebreathing (recycling) of each breath. This technology produces no bubbles, thereby concealing the diver's activities from those on the surface, and allowing a diver to stay underwater longer compared with normal diving equipment." The indictment specifies that "rEvo III rebreathers ('rebreathers') are on the Commerce Control List and are classified by the Department of Commerce, Bureau of Industry and Security under [Export Classification Number] 8A002.q.1 (closed-circuit rebreathers). An

export license was required from the Department of Commerce to export them to Libya."

To establish a material variance, Sotis must show that (1) the facts proved at trial materially deviated from the facts alleged in the indictment, and (2) he suffered substantial prejudice as a result. *See United States v. Chastain*, 198 F.3d 1338, 1349 (11th Cir. 1999). To satisfy the first element, Sotis must show that there was not "substantial evidence such that a reasonable jury could have determined beyond a reasonable doubt" that the rEvo III rebreathers were closed circuit and could not be exported to Libya without a license from Commerce. *See Calderon*, 127 F.3d at 1327. In evaluating prejudice, we ask "whether the proof at trial differed so greatly from the charges that the defendant was unfairly surprised and was unable to prepare an adequate defense." *Goldstein*, 989 F.3d at 1199 (alterations accepted) (quoting *United States v. Lander*, 668 F.3d 1289, 1295 (11th Cir. 2012)).

We assume without deciding that the facts proved at trial materially deviated from the facts alleged in the indictment, but we hold that Sotis failed to prove that he was prejudiced by the variance. Sotis conceded at trial that the rebreathers were on the Commerce Control List, required a license, and that Add Helium did not obtain a license before attempting to export them. And even if the government had failed to prove that the rebreathers were closed circuit, it would have proved that they were at least semiclosed circuit and thus subject to identical export control requirements. *See* 15 C.F.R. Pt. 774, Supp. No. 1, Cat 8 (Commerce

Control List). Thus, even the material variance Sotis alleges would not have prevented him from preparing an adequate defense.

## B. Opinion Testimony

Moving to his next tranche of arguments, Sotis contends that one expert witness, Tu, and one lay witness, Wagner, invaded the province of the jury by opining on an ultimate issue in the case and that he was prejudiced by their testimony. Again, we disagree.

### 1. Improper Expert Opinion

Sotis first argues that Tu improperly testified that the rebreathers were closed circuit and required a license for export to Libya but "did not go through the analysis, or give the jury the facts upon which to make that determination themselves." But Sotis did not object to this portion of Tu's testimony. He objected only to repetitive questioning about the date on which Tu communicated his initial licensing determination to Wagner. And Sotis conceded from the beginning both that the rEvo III rebreathers required a license to ship to Libya and that he did not have a license. *See, e.g.*, Trial Tr. vol. 1, 29 (Doc. 175) ("[W]e are not disputing that the license is required. We are not disputing that they didn't have a license.").

Because Sotis did not object to the substance of Tu's testimony at trial, we review only for plain error. *See Goulah v. Ford Motor Co.*, 118 F.3d 1478, 1483 (11th Cir. 1997) ("An objection on one ground will not preserve an error for appeal on other grounds."). That standard requires "(1) error, (2) that is plain, and (3) that has affected the defendant's substantial rights." *United States v. Hesser*,

800 F.3d 1310, 1324 (11th Cir. 2015) (per curiam) (quotations omitted). Even then, we may exercise discretion to correct a forfeited error only if it "seriously affects the fairness, integrity or public reputation of judicial proceedings." *United States v. Moriarty*, 429 F.3d 1012, 1019 (11th Cir. 2005) (per curiam) (alterations accepted) (quotations omitted).

Here, there simply was no error. As a senior engineer at Commerce's Bureau of Industry and Security, Tu testified that closed-circuit and semi-closed-circuit rebreathers were on the Commerce Control List and that he had concluded a license was required to export them to Libya based on that designation. He further testified that he informed Wagner of these conclusions. That testimony was not improper. "A district court may admit expert testimony that 'help[s] the trier of fact to understand the evidence or to determine a fact in issue.'" *United States v. Duldulao*, ___ F.4th ___, 2023 WL 8251507, at *20 (11th Cir. Nov. 29, 2023) (alteration in original) (quoting FED. R. EVID. 702(a)). And generally, "[a]n opinion is not objectionable just because it embraces an ultimate issue." *Id.* (alteration in original) (quoting FED. R. EVID. 704(a)).

In a criminal case, however, "an expert witness must not state an opinion about whether the defendant did or did not have a mental state or condition that constitutes an element of the crime charged or of a defense. Those matters are for the trier of fact alone." FED. R. EVID. 704(b). Thus, although "Rule 704 bars a witness from giving legal opinions (e.g., 'the defendant broke the law')

and from discussing culpable mental states (e.g., 'and he did it knowingly')[,] [a]n expert witness can give his opinion about an ultimate issue so long as he does not tell the jury what result to reach." *Duldulao*, ___ F.4th ___, 2023 WL 8251507, at *20.

Tu's testimony concerned his determination that the Commerce Control List and Commerce Country Chart required a license to ship closed-circuit and semi-closed-circuit rebreathers to Libya. He never opined on Sotis's mental state or the ultimate legal issue of whether the rEvo III rebreathers were closed- or semi-closed circuit. There was no reason to do so because (1) Tu never interacted with anyone at Add Helium and had nothing to say about Sotis's mental state, and (2) Sotis conceded in his opening statement that rEvo III rebreathers were either closed- or semi-closed circuit and thus required an export license. Because Tu did not "tell the jury what result to reach," the district court did not err in permitting his testimony. *Duldulao*, ___ F.4th ___, 2023 WL 8251507, at *20.

### 2. Improper Lay Opinion

Sotis next argues that Wagner improperly opined on Sotis's mental state when he testified that he had never seen a case with "this level of willfulness." When the government asked Wagner to compare Sotis's willfulness with his experience in other cases, Sotis objected to the government asking "[a]bout other cases." The district court instructed the government to rephrase the question, and eventually overruled Sotis's objection because Sotis "opened the door" on cross examination by asking Wagner whether he could

have charged Voissem and Sotis with civil penalties instead of criminal penalties. The court later took up the matter with counsel after the jury had been excused for the day. The court told counsel that she had "expected the objection to be to the word willfulness, but there was no objection to that." The court ultimately allowed the question and answer to stand without further instruction to the jury. Thus, although Sotis objected to Wagner's testimony at trial, he did so on different grounds from those now raised on appeal, so we review for plain error. *See Goulah*, 118 F.3d at 1483.

We conclude that Wagner's opinion was improper but that allowing it was not plain error. Rule 701 restricts a lay witness to testimony rationally based on the witness's perception, that is helpful to determining a fact in issue, and that is not based on specialized knowledge. FED. R. EVID. 701; *see also United States v. Stahlman*, 934 F.3d 1199, 1219 (11th Cir. 2019). Wagner's testimony that he had never seen so much willfulness was improper because it purported to tell the jury about Sotis's state of mind—something to which neither he nor any other witness could testify based on his rationally-based perception. Permitting his testimony was error.

But there is no indication that this error "affect[ed] substantial rights" because the jury was presented with overwhelming evidence of willfulness. *See United States v. Vallejo*, 297 F.3d 1154, 1165 (11th Cir. 2002). The government presented testimony from multiple witnesses that Commerce informed Sotis and Add Helium that the rebreathers could not leave the company's warehouse until a licensing determination was made. Sotis then deliberately failed

to inform the Zaghabs about the licensing requirements, arranged for the rebreathers to be shipped, and attempted to escape responsibility by not informing Wagner that he had disobeyed the agent's instructions. Given this evidence, the question of Sotis's willfulness was anything but "a close one." *Chapman v. California*, 386 U.S. 18, 22 (1967). Thus, allowing Wagner to testify as to willfulness was not plain error.

### *C. Sentencing*

Rounding out the issues on appeal, Sotis claims that his sentence was both procedurally and substantively unreasonable. He argues that the district court wrongly sentenced him using § 2M5.2 of the Guidelines, resulting in an inflated base offense level, and that a disparity exists between his sentence and those of similarly situated defendants. We agree with Sotis that the district court erred in applying § 2M5.2 but conclude that any error was harmless. And Sotis's sentence was not substantively unreasonable.

### 1. Procedural Reasonableness

Sotis begins by arguing that the district court "erred in its determination that [§] 2M5.2 was the proper section of the Guidelines to determine a Base Level Offense." He concedes that there are "three possible [guidelines] sections for these types of convictions": § 2M5.1, § 2M5.2, and § 2M5.3, but argues that the rule of lenity should weigh in favor of applying § 2M5.1(a)(2) in the face of ambiguity.

District courts employ a two-step process to determine the appropriate base offense level. First, the court determines the

guideline section that is "most appropriate for the offense conduct charged in the count of which the defendant was convicted." *Belfast*, 611 F.3d at 824 (quoting U.S.S.G. § 1B1.2 cmt. n.1). Second, the court examines the defendant's relevant conduct to determine the correct guideline range based on the guideline section. *Id.* "In reviewing the district court's . . . [g]uidelines calculation, we review the findings of fact for clear error and the application of the Sentencing Guidelines to those facts *de novo.*" *Id.* at 823. Where, as here, "the legal question of whether the district court applied the correct guideline is 'fact-bound,' we review that legal determination for clear error, because the district court has greater expertise at sentencing, and there is generally limited precedential value in the decision." *Id.* Because Sotis clearly and repeatedly objected to the application of § 2M5.2 at sentencing, we review for clear error the district court's conclusion that it was the most appropriate guideline.

We begin with the guidelines that Sotis concedes may be applicable:

- Section 2M5.1 prescribes a base offense level of 14 for "Evasion of Export Controls; Financial Transactions with Countries Supporting International Terrorism." § 2M5.1(a)(2). That increases to 26 if the defendant evaded national security controls or controls relating to nuclear, biological, or chemical weapons, or if the offense involved a financial transaction with a country supporting international terrorism. *Id.* § 2M5.1(a)(1).

- Section 2M5.2 prescribes a base offense level of 26 for the "Exportation of Arms, Munitions, or Military Equipment or Services Without Required Validated Export License." *Id.* § 2M5.2(a)(1). If the offense involved only non-fully automated small arms and the number of weapons did not exceed two, or the items constituted less than 500 rounds of ammunition for non-fully automatic small arms, the base offense level is reduced to 14. *Id.* § 2M5.2(a)(2).

- Finally, § 2M5.3 prescribes a base offense level of 26 for "Providing Material Support or Resources to Designated Foreign Terrorist Organizations or Specially Designated Global Terrorists, or For a Terrorist Purpose." *Id.* § 2M5.3.

No one contends, and for good reason, that either § 2M5.2(a)(2) or § 2M5.3 is the best fit for Sotis's crimes. Accordingly, we limit our inquiry to whether it was clear error to apply § 2M5.2(a)(1) over § 2M5.1. The parties' briefs engage in an extended debate over whether § 2M5.2 applies only to items on the United States Munitions List and whether a dual use item with potential military applications counts as "military equipment." We need not answer those nuanced questions here because, at least with respect to rebreathers like the rEvo IIIs at issue, the EAR itself provides a clear dividing line.

Classification Number 8A002.q, the export control Sotis was charged with and convicted of violating, governs "[u]nderwater

swimming and diving equipment as follows[:] q.1. Closed circuit rebreathers; q.2. Semi-closed circuit rebreathers." *See* 15 C.F.R. Pt. 774, Supp. No. 1, Cat. 8 (Commerce Control List). But that is not the only Classification Number discussing rebreathers. A note to 8A002.q directs readers to "see [Classification Number] 8A620.f" "[f]or equipment and devices 'specially designed' for military use." *Id.* Classification Number 8A620.f in turn controls "[d]iving and underwater swimming apparatus *specially designed or modified for military use*, as follows: f.1. *Self-contained diving rebreathers, closed or semi-closed circuit*; f.2. Underwater swimming apparatus specially designed for use with the diving apparatus specified in subparagraph f.1." *Id.* (emphases added). 8A620 refers to 8A002 twice. First in the "List of Items Controlled" section, and second as a "[s]ee also" note to 8A620.f. *Id.* The first of these references instructs that "[f]or controls on *nonmilitary* submersible vehicles, oceanographic and associated equipment, see [Classification Numbers] 8A001, *8A002*, and *8A992*." *Id.* (emphases added).

The purpose of 8A620.f is to separately (and quite strictly) control the export of closed- or semi-closed-circuit rebreathers that are "specifically designed or modified for military use." That contrasts with 8A002, which in the EAR's own words controls (far more loosely) the export of "nonmilitary submersible vehicles, oceanographic and associated equipment." The narrower definition in 8A620.f is a dead ringer for § 2M5.2's use of the phrase "military equipment," at least with respect to rebreathers. And the broader nonmilitary standard in 8A002.q naturally encompasses products like the rEvo III, which might still pose a threat to the

United States' security interests in the wrong hands despite not being purpose-built or modified for military use.

The government charged and convicted Sotis under 8A002.q, the export control governing "nonmilitary" rebreathers. It had the option of attempting a prosecution under 8A620.f. That would have required proving an additional element, that the rEvo IIIs were "specifically designed or modified for military use." It would have also situated a conviction squarely within the heartland of § 2M5.2(a)(1). Presumably, and as Tu testified at trial, the government made this choice because it believed that the appropriate Classification Number for a rEvo III rebreather was 8A002.q (and thus implicitly not 8A620.f). Like the EAR, the Guidelines contemplate a distinction between equipment purpose-built or modified for military use and other equipment that may still be subject to "national security [export] controls." U.S.S.G. § 2M5.1(a)(1). In fact, the Sentencing Commission made exactly that distinction when it amended the Guidelines to index § 2M5.1 to IEEPA offenses. *See* United States Sentencing Guidelines Manual, supp. to app. C, amend. 777 (Nov. 2013) ("Not all offenses under [the IEEPA] involve munitions, cultural resources, or wildlife, so a reference to an additional guideline is warranted. For example, [an IEEPA] offense may be based on the export of ordinary commercial goods in violation of economic sanctions or on the export of 'dual-use' goods (*i.e.*, goods that have both commercial and military applications). For such cases, the additional reference to § 2M5.1 promotes clarity and consistency in guideline application, and the penalty structure of § 2M5.1 provides appropriate distinctions between

offenses that violate national security controls and offenses that do not.").

Nevertheless, we conclude that any potential error in selecting § 2M5.2(a)(1) was harmless because § 2M5.1(a)(1) would have resulted in an identical guidelines range. Section 2M5.1(a)(1) applies "if . . . national security controls . . . were evaded." § 2M5.1(a)(1). The EAR, as reauthorized by the President under the IEEPA, is clearly a system of "national security controls." *See* 15 C.F.R. § 730.6 (explaining that the EAR is "intended to serve the national security, foreign policy, nonproliferation of weapons of mass destruction, and other interests of the United States"); *see also United States v. Elashyi*, 554 F.3d 480, 508–09 (5th Cir. 2008) (holding that export controls under the IEEPA are "national security controls" for purposes of § 2M5.1(a)(1)); *United States v. McKeeve*, 131 F.3d 1, 14 (1st Cir. 1997) (same); *United States v. Shetterly*, 971 F.2d 67, 76 (7th Cir. 1992) (same under the EAA). The base offense level under § 2M5.1(a)(1) is 26, the same as under § 2M5.2(a)(1). And although the district court departed downward five levels under Application Note 2 to § 2M5.2 to reach a final offense level of 21 before enhancements, an identical note would have contemplated an identical departure under § 2M5.1. *See* U.S.S.G. § 2M5.1 cmt. n.2. Thus, there is no "reasonable probability" that Sotis's sentence would have changed. *See Molina-Martinez v. United States*, 578 U.S. 189, 200 (2016) (explaining that although a defendant will commonly be able to show prejudice when a "district court mistakenly deemed applicable an incorrect, higher [g]uidelines range," "[t]here may be instances when, despite application of an erroneous

[g]uidelines range, a reasonable probability of prejudice does not exist").

### 2. Substantive Reasonableness

Finally, Sotis argues that the following six cases show that his sentence is disparate from others similarly situated: *United States v. Vasquez*, 745 F. App'x 321 (11th Cir. 2018) (per curiam); *United States v. Francois*, 661 F. App'x 587 (11th Cir. 2016) (per curiam); *United States v. Piquet*, 372 F. App'x 42 (11th Cir. 2010) (per curiam); *United States v. Banki*, 685 F.3d 99 (2d Cir. 2012); *United States v. Amirnazmi*, 645 F.3d 564 (3d Cir. 2011); and *United States v. Reyes*, 270 F.3d 1158 (7th Cir. 2001). Because he raised this argument below, we review under a "deferential abuse of discretion standard." *United States v. Early*, 686 F.3d 1219, 1221 (11th Cir. 2012). We will vacate Sotis's sentence "only if we are left with the definite and firm conviction that the district court committed a clear error of judgment in weighing the § 3553(a) factors by arriving at a sentence that lies outside the range of reasonable sentences dictated by the facts of the case." *Id.* (quotations omitted).

Although a district court must "avoid unwarranted sentence disparities" among similarly situated defendants, 18 U.S.C. § 3553(a)(6), "[a] well-founded claim of disparity . . . assumes that apples are being compared to apples," *Docampo*, 573 F.3d at 1101 (quoting *United States v. Mateo-Espejo*, 426 F.3d 508, 514 (1st Cir. 2005)). Sotis offered each decision he presents on appeal to the district court to argue that his sentence was disparate from similarly situated defendants. The district court rejected that argument

because the defendants in those cases were not similarly situated to Sotis. Unlike Sotis, several of the cited defendants either pleaded guilty, *see Francois*, 661 F. App'x at 588–89; *Vasquez*, 745 F. App'x at 323; received a more severe sentence, *see Piquet*, 372 Fed. App'x at 47 (60 months); or received a sentence under an older version of the Guidelines, *see Reyes*, 270 F.3d at 1161. In *Banki*, the defendant received a 30-month prison term for operating an illegal money-transmitting business that served Iran. 685 F.3d at 102–05. While a serious crime, that is a far cry from exporting rebreathers to Libya after being ordered not to by a federal agent. The defendant in *Banki* was also found guilty only as an aider and abettor as to two of the export control counts. *Id.* at 105. And although the defendant in *Amirnazmi* received a 48-month prison term, 645 F.3d at 571, the nine-month delta between that sentence and Sotis's is reasonable given the especially culpable nature of Sotis's conduct, including threatening to kill Robotka and deceiving both innocent third parties and a federal agent.

Put differently, the district court rejected Sotis's disparity arguments because they were attempting to compare apples to oranges. We agree with both the district court's analysis and its conclusion—the cases Sotis cites do not involve similarly situated defendants. Thus, the district court did not abuse its discretion in concluding that no sentencing disparity would result from imposing a sentence of 57 months. Sotis's sentence is not substantively unreasonable.

## IV. CONCLUSION

Accordingly, we **AFFIRM** Sotis's conviction and sentence.